The STATE of Ohio, Appellee,

v.

MULKEY, Appellant.

[Cite as *State v. Mulkey* (1994), 98 Ohio App.3d 773.]

Court of Appeals of Ohio,
Franklin County.

No. 94APA04–495.

Decided Nov. 22, 1994.

774

*Michael Miller,* Franklin County Prosecuting Attorney, and *Katherine Press,* Assistant Prosecuting Attorney, for appellee.

*Dennis C. Belli,* for appellant.

---

PEGGY BRYANT, Judge.

Defendant-appellant, Gary T. Mulkey, appeals from a judgment of the Franklin County Court of Common Pleas finding him guilty of one count of aggravated murder in violation of R.C. 2903.01(A) in connection with the stabbing death of Mark Dandridge.

According to the state's evidence, between 4:00 p.m. and 5:00 p.m. on March 16, 1993, defendant, then seventeen years of age, and two friends, Timothy Blankenship and Christopher Nance, then fifteen and seventeen years of age, respectively, consumed a fifth of Jack Daniel's whiskey in the basement of the home of defendant's aunt. At approximately 5:00 p.m., the three boys left the home on foot, proceeding South on Heyl Avenue. The boys stopped and spoke briefly with Nancy Nguyen, a high school student who was playing basketball at 996 Heyl Avenue. After leaving Nguyen, the boys continued South on Heyl Avenue, and as they entered the Whittier Street intersection, the boys noticed Mark Dandridge, a thirty-year-old black male who had entered the intersection from Whittier Street.

Nguyen, who witnessed the incident from where she had been playing basketball, testified that as Dandridge approached the boys in the intersection, Blankenship hit him. Defendant and Nance immediately joined the attack; all three boys punching and kicking Dandridge, who merely tried to fend off the blows and

shield his head with his arm. After a few moments, defendant and Nance stopped attacking Dandridge and walked a short distance away. Blankenship, however, continued to hit Dandridge, who by that time was on his knees. Defendant and Nance then returned and resumed hitting and kicking Dandridge. Shortly thereafter, Dandridge collapsed, and the three boys fled. Nguyen testified that she did not see anyone stab Dandridge.

Defendant's version of the events was presented to the jury through a videotaped statement made to police shortly following his arrest. According to defendant, he and his friends approached Dandridge; Blankenship and Dandridge exchanged words. Dandridge swung at Nance and missed; he then swung at defendant. Defendant responded by stabbing Dandridge in the chest. Dandridge swung at defendant again, defendant stabbed Dandridge in the head, and the three boys fled.

Defendant was arrested at approximately 11:50 p.m. on March 16, 1993, and charged with felonious assault in connection with the attack on Dandridge. At approximately 1:00 p.m. on March 17, 1993, Dandridge died. An autopsy revealed the cause of death to be a stab wound on the left side of the victim's head which penetrated the skull and brain to a depth of three and five eighths inches. As a result, defendant was charged with aggravated murder.

Defendant was bound over for trial as an adult. Prior to trial, defendant moved to suppress his confession, videotaped by detectives from the Columbus Police Department following his arrest; defendant argued that his waiver of his Fifth and Sixth Amendment rights was not voluntary, knowing and intelligent. Following an evidentiary hearing, the trial court overruled defendant's motion to suppress.

Defendant's case was tried to a jury. At the close of the state's case, the defense rested and moved for acquittal on the charge of aggravated murder, asserting that the state had failed to present evidence sufficient to allow the jury to find that defendant had killed Dandridge with "prior calculation and design." The trial court overruled defendant's motion for acquittal, the jury found defendant guilty of aggravated murder, and the trial court imposed sentence.

Defendant appeals, assigning the following errors:

"I. The state having failed to adduce any evidence that the killing of the decedent was committed with prior calculation and design, the jury's verdict finding defendant-appellant guilty of aggravated murder under R.C. 2903.01(A) is not supported by sufficient evidence and is against the manifest weight of the evidence.

"II. Where defendant-appellant produced the expert testimony of a forensic psychologist to the effect that he lacked the mental capacity to knowingly and

intelligently waive his privilege against self-incrimination and his right to counsel under the federal and state Constitutions, and the state failed to produce any evidence or testimony to rebut the findings and conclusions of the examining psychologist, the court of common pleas erred in denying defendant-appellant's motion to suppress his inculpatory statements made in response to custodial interrogation.

"III. The court of common pleas committed plain error in admitting into evidence and in permitting the jury to examine during its deliberations an awl that was not found on the person or in the possession of defendant-appellant, or at or near the homicide scene, that was not otherwise identified by a witness as the weapon, or substantially similar to the weapon, used in the homicide, and that was purchased by the prosecuting attorney at a hardware store.

"IV. The failure of the court of common pleas to instruct the jury on the lesser included offense of involuntary manslaughter based on the underlying felony of felonious assault constituted plain error.

"V. The court of common pleas erred in permitting the investigating homicide detective to testify over objection that, in his opinion, defendant-appellant's claim that the decedent had initiated the altercation which led to his death could not be substantiated.

"VI. To the extent that the errors assigned in Assignments of Error Numbers three and four are not cognizable under the plain error rule, defendant-appellant was denied his right to the effective assistance of counsel guaranteed to him under the Sixth and Fourteenth Amendments to the United States Constitution."

Defendant's first assignment of error alleges that the state presented insufficient evidence to establish the element of "prior calculation and design" necessary to support a conviction for aggravated murder.

In determining the sufficiency of the evidence, our function "is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. (*Jackson v. Virginia* [1979], 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, followed.)" *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

R.C. 2903.01(A) defines the crime of aggravated murder:

"No person shall purposely, and with prior calculation and design, cause the death of another."

Although the Revised Code does not define the phrase "prior calculation and design," the Supreme Court has interpreted the phrase to require proof of "more than the few moments of deliberation permitted in common-law interpretations of the former murder statute, and to require a scheme designed to implement the calculated decision to kill." *State v. Cotton* (1978), 56 Ohio St.2d 8, 11, 10 O.O.3d 4, 6, 381 N.E.2d 190, 193. "Instantaneous deliberation is not sufficient to constitute 'prior calculation and design.'" *Id.* at paragraph two of the syllabus. Similarly, the 1973 Legislative Service Commission Comment to R.C. 2903.01 states that:

"* * * The section employs the phrase, 'prior calculation and design,' to indicate studied care in planning or analyzing the means of the crime, as well as a scheme compassing the death of the victim. Neither the degree of care nor the length of time the offender takes to ponder the crime beforehand are critical factors in themselves, but they must amount to more than momentary deliberation." See, also, *State v. D'Ambrosio* (1993), 67 Ohio St.3d 185, 196, 616 N.E.2d 909, 918.

However, "[w]here evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified. (*State v. Cotton* [1978], 56 Ohio St.2d 8 [10 O.O.3d 4, 381 N.E.2d 190], paragraph three of the syllabus, approved and followed.)" *State v. Robbins* (1979), 58 Ohio St.2d 74, 12 O.O.3d 84, 388 N.E.2d 755, paragraph one of the syllabus.

■ Important factors we consider in determining whether the circumstances surrounding a homicide show a scheme designed in furtherance of a calculated decision to kill include (1) whether the accused and the victim knew one another prior to the killing, and, if so, the nature of their relationship, (2) whether the accused gave thought or preparation to the method or place of the killing, and (3) whether the events occurred over time or almost instantaneously. *State v. Jenkins* (1976), 48 Ohio App.2d 99, 102, 2 O.O.3d 73, 75, 355 N.E.2d 825, 828; see, also, *State v. Davis* (1988), 38 Ohio St.3d 361, 528 N.E.2d 925; *Robbins, supra; State v. Bailey* (1992), 90 Ohio App.3d 58, 627 N.E.2d 1078.

■ Here, the evidence in that regard reveals a chance meeting between total strangers. The state presented no evidence that defendant gave any thought or preparation to how or where he might kill Dandridge. While the state relies heavily on the break in the fight as evidence of prior calculation and design, the state presented no evidence that defendant obtained or readied the weapon during his momentary withdrawal from the attack on the victim. Cf. *Robbins,*

*supra* (evidence that defendant left the fight, went to his apartment, obtained a weapon, returned to the fight and stabbed the victim supported a finding of prior calculation and a scheme to implement the calculated decision). Rather, the evidence presented, even when viewed in a light most favorable to the prosecution, supports a finding only of a purposeful killing after instantaneous deliberation arising out of the attack upon the victim. While the crime defendant committed unquestionably is heinous, that factor alone is insufficient to support a conviction for aggravated murder under the language of the statute.

Defendant's first assignment of error is sustained to the extent that his conviction for aggravated murder is modified to a conviction for murder, given the absence of evidence supporting a finding of prior calculation and design.

In his second assignment of error, defendant alleges that the trial court erred in overruling his motion to suppress his confession; defendant asserts that the evidence presented at the suppression hearing established that defendant lacked the mental capacity to knowingly and intelligently waive his *"Miranda* rights."

In *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, the Supreme Court announced the rule prohibiting the prosecution from using statements stemming from a custodial police interrogation of a defendant unless the prosecution demonstrates that prior to any questioning the defendant was warned that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 707. However, a defendant may waive the rights conveyed in the *Miranda* warnings, "provided the waiver is made voluntarily, knowingly and intelligently." *Id.* To determine whether a waiver satisfies the *Miranda* standard, we employ a two-step analysis:

" * * * First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. * * *" *Moran v. Burbine* (1986), 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410, 421. See, also, *State v. Dailey* (1990), 53 Ohio St.3d 88, 91, 559 N.E.2d 459, 462–463.

Here, the videotaped police interrogation of defendant demonstrates that the police fully complied with *Miranda.* The required warnings were read to defendant; defendant was asked to read the warnings back to the officers, and

with some help he complied; defendant was asked if he understood his rights, and responded that he did. Finally, the officers obtained a written waiver prior to eliciting defendant's confession. The questioning officers did not subject defendant to any form of intimidation, coercion or deception in obtaining his waiver, and the trial court thus determined that defendant's waiver was voluntary.

Defendant argues, however, that his waiver was not knowing and intelligent, as his limited mental capacity prevented him from understanding the nature of his rights or the consequences of abandoning them. In support of his contentions, defendant called Daniel L. Davis, a doctor of forensic psychology, to testify at the suppression hearing regarding defendant's mental capacity and his ability to knowingly and intelligently waive his rights. Dr. Davis testified that his tests revealed defendant had an I.Q. of seventy-five, functioned at the verbal level of a ten or twelve year old, and read at the third-grade level. Based upon these results, Dr. Davis placed defendant in "a range that is slightly above * * * the mildly mentally retarded range, and below the average range." Dr. Davis testified that in his view defendant lacked sufficient mental capacity to understand his rights or the consequences of relinquishing them, and thus he could not knowingly and intelligently waive his rights. Because the state did not present expert testimony to rebut the testimony of Dr. Davis, defendant argues on appeal that he was entitled to have his confession suppressed as a matter of law.

■ Contrary to defendant's contentions, the question of whether a waiver was knowing and intelligent is a factual issue that must be determined based upon the "totality of the circumstances." *Moran, supra; State v. Taylor* (Aug. 27, 1987), Meigs App. No. 377, unreported, 1987 WL 16084. Mental capacity is but one factor to be considered in making the determination. See *Taylor, supra.* Indeed, the Supreme Court held that an eighteen year old with an I.Q. of seventy-one and a reading level below the third-grade level was capable of knowingly and intelligently waiving his rights based upon the "totality of the circumstances." *Dailey, supra;* see, also, *State v. Edwards* (1976), 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051.

■ Here, despite the testimony of defendant's expert, the videotape presented sufficient evidence to allow the trial court to conclude that defendant understood that he was not required to speak to the detectives, that he could talk to a lawyer if he wished, and that his admission that he stabbed the victim could be used against him in some respect. "The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Colorado v. Spring* (1987), 479 U.S. 564, 574, 107 S.Ct. 851, 857, 93 L.Ed.2d 954, 966.

Defendant's second assignment of error is overruled.

Defendant's third and fourth assignments of error are related in that both involve matters to which defendant did not object at trial; thus, we address them jointly.

In this third assignment of error, defendant challenges the trial court's admitting a scratch awl into evidence as a substitute for the actual murder weapon, which was not recovered.

During questioning by police detectives, defendant described the weapon he used to stab the victim as follows:

"Q. What, what did you stick him with?

"A. A screwdriver thing.

" * * *

"Q. You said you stuck a man, OK. You had a screwdriver? Is that what you had?

"A. Something like a screwdriver. I don't know what it was.

"Q. Does it got a head like a screwdriver?

"A. Something like that.

"Q. Is it smaller than the head of a screwdriver? Is it round, is it square, is it pointed?

"A. I think, pointed.

"Q. Pointed, Okay. Is it something maybe that you would scratch into something, a surface, that you wanted to mark something?

"A. (defendant shrugs)."

Because defendant's description of the weapon fit the attributes of a scratch awl, the prosecution sought, without objection, to have a scratch awl that had been purchased at a local hardware store admitted into evidence for "demonstrative purposes." Defendant now argues that the admission of the scratch awl was so prejudicial as to constitute plain error.

Similarly, in his fourth assignment of error, defendant argues that the trial court's failure to instruct the jury on the lesser included offense of involuntary manslaughter, while not raised at trial, constitutes plain error.

Crim.R. 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." In construing Crim.R. 52(B), the Supreme Court has stated that "[n]otice of plain error * * * is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v.*

*Long* (1978), 53 Ohio St.2d 91, 97, 7 O.O.3d 178, 181, 372 N.E.2d 804, 808. "Plain error does not exist unless it can be said that but for the error, the outcome of the trial would clearly have been otherwise." *State v. Moreland* (1990), 50 Ohio St.3d 58, 62, 552 N.E.2d 894, 899.

■ Here, neither the admission of the scratch awl nor the trial court's failure to instruct the jury on involuntary manslaughter rises to the level of plain error. Given defendant's admission that he stabbed the victim twice, once in the chest and again in the head, the evidence of murder was overwhelming; the outcome of defendant's trial would not have been different but for the errors alleged by defendant, either individually or cumulatively. Defendant's third and fourth assignments of error are overruled.

In his sixth assignment of error, defendant argues that even if the admission of the scratch awl and the trial court's failure to instruct the jury on involuntary manslaughter do not rise to the level of plain error, his trial counsel's failure to raise these issues constitutes ineffective assistance of counsel.

■ In order to establish a claim of ineffective assistance of counsel, a defendant must show that his counsel's performance was unreasonable under prevailing professional norms and that "there is a reasonable probability that, but for [his] counsel's unprofessional errors, the result of the proceedings would have been different." *Strickland v. Washington* (1984), 466 U.S. 668, 687–688, 694, 104 S.Ct. 2052, 2064–2065, 2068, 80 L.Ed.2d 674, 693–694, 698.

■ Even if we assume that the failure of defendant's trial counsel to object to the admission of the scratch awl or the trial court's jury instructions was unreasonable under prevailing professional norms, defendant has failed to establish ineffective assistance of trial counsel, as we have already concluded that the results of defendant's trial would not have been different but for either or both of the errors alleged by defendant. Defendant's sixth assignment of error is overruled.

In his fifth assignment of error, defendant argues that the trial court erred in permitting Detective Bisutti to render his opinion as a lay witness regarding defendant's statement that the victim was the initial aggressor. Specifically, Detective Bisutti testified as follows:

"Q. So, when you indicated previously that Gary Mulkey advised you that Mark Dandridge had swung at them, those words were from Gary Mulkey, is that correct?

"A. Yes.

"Q. And, sir, during your investigation, did you find any other evidence to substantiate that?

"Mr. Edwards: Objection.

"The court: Overruled.

" * * *

"Q. (By Ms. Peterson) Sir, once again, the question, did you find any evidence to substantiate the statement of Gary Mulkey that Mark Dandridge had swung at them?

"A. No.

"Q. So, in your investigation, did you determine whether there were any weapons found at the scene?

"A. There were no weapons found at the scene.

"Q. And, sir, did you, during your investigation, obtain any evidence to indicate that Mark Dandridge was carrying any type of weapon?

"A. No.

"Q. Sir, during your investigation, did you determine what, if anything, Mark Dandridge was carrying?

"A. We believe at the time Mark was carrying some books."

■ Pursuant to Evid.R. 701, lay opinion testimony must be "(1) 'rationally based on the perception of the witness,' *i.e.*, the witness must have firsthand knowledge of the subject of his testimony and the opinion must be one that a rational person would form on the basis of the observed facts; and (2) 'helpful,' *i.e.*, it must aid the trier of fact in understanding the testimony of the witness or in determining a fact in issue." *Lee v. Baldwin* (1987), 35 Ohio App.3d 47, 49, 519 N.E.2d 662, 663.

■ Defendant argues that Detective Bisutti's testimony amounted to improper lay-opinion testimony, because the testimony related to the events leading up to the attack on Dandridge, an event about which Detective Bisutti had no firsthand knowledge. Defendant mischaracterizes Detective Bisutti's testimony. Contrary to defendant's assertions, Detective Bisutti did not give his opinion regarding whether he believed that the victim was the initial aggressor. Rather, Detective Bisutti merely testified that no evidence had been found which indicated that the victim was the initial aggressor. The presence or absence of such evidence was a matter about which Detective Bisutti had firsthand knowledge. Defendant's fifth assignment of error is overruled.

Having sustained defendant's first assignment of error to the extent indicated, but having overruled defendant's second, third, fourth, fifth and sixth assignments of error, defendant's conviction for aggravated murder is modified to a

conviction for murder, and this matter is remanded to the trial court for resentencing.

*Judgment affirmed as modified
and cause remanded for re-sentencing.*

JOHN C. YOUNG and TYACK, JJ., concur.