The STATE of Ohio, Appellee,

v.

MARDIS, Appellant.

[Cite as *State v. Mardis* (1999), 134 Ohio App.3d 6.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 98AP–1059.

Decided Aug. 19, 1999.

8

---

*Ron O'Brien,* Franklin County Prosecuting Attorney, and *Amy H. Kulesa,* Assistant Prosecuting Attorney, for appellee.

*Philip L. Allen,* for appellant.

---

BROWN, Judge.

Lee A. Mardis, appellant, appeals a July 23, 1998 judgment of the Franklin County Court of Common Pleas finding appellant guilty of aggravated murder, in violation of R.C. 2903.01, and finding that he used a firearm in the commission of the offense.

On August 30, 1997, appellant, who was fifteen years old, was arrested for the fatal shooting of William B. Stiert, who sustained a gunshot wound to the head during the early morning hours of the same date. The prosecution filed a motion in the Juvenile Branch of the Franklin County Court of Common Pleas, Division

of Domestic Relations, seeking an order from the juvenile court relinquishing jurisdiction of the case to the general division for criminal prosecution of the teenager as an adult. The court ultimately granted the state's motion, transferring the case to the general division pursuant to an order journalized November 12, 1997.

Appellant was subsequently indicted by the Franklin County Grand Jury on January 9, 1998, charged with one count of aggravated murder based upon the theory that he purposely, and with prior calculation and design, caused Stiert's death. The charge also carried a firearm specification. At trial, there was essentially no dispute that appellant fired the gun that killed Stiert. Because appellant ultimately testified that the shooting was accidental, the issue was his intent or lack thereof.

On July 17, 1998, a jury found appellant guilty of aggravated murder, and found that he used a firearm in the commission of the offense. For the aggravated murder conviction, the court sentenced him to serve a term of imprisonment of twenty years to life. The court also ordered that appellant serve an additional consecutive term of three years for the firearm specification. The trial court journalized its judgment and sentence pursuant to an entry filed July 23, 1998.

Appellant has timely appealed, assigning the following three errors for our consideration:

Appellant's First Assignment of Error:

"[The] trial court erred as a matter [of] law or abused its discretion in denying defendant–appellant's motion to suppress evidence."

Appellant's Second Assignment of Error:

"[The] trial court erred as a matter of law or abused its discretion in denying defendant–appellant's. motion in limine allowing testimony regarding prior bad acts."

Appellant's Third Assignment of Error:

"[The] trial court erred as a matter [of] law or abused its discretion in not granting a judgment of acquittal pursuant to Criminal Rule 29 for the jury verdict was against the manifest weight of the evidence."

To facilitate an understanding of the facts, we will first address appellant's third assignment of error. In his third assignment of error, appellant contends that the trial court erred in denying his Crim.R. 29 motion because "the jury verdict was against the manifest weight of the evidence." Specifically, this argument raises two separate issues: Crim.R. 29(A) addresses the sufficiency of the evidence; a manifest weight argument requires a slightly different analysis.

"The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *State v. Thompkins* (1997), 78 Ohio St.3d 380, 678 N.E.2d 541, paragraph two of the syllabus. In *Thompkins,* the court explained the distinctions at length:

"With respect to sufficiency of the evidence, ' "sufficiency" is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.' Black's Law Dictionary (6 Ed.1990) 1433. See, also, Crim.R. 29(A) (motion for judgment of acquittal can be granted by the trial court if the evidence is insufficient to sustain a conviction). In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. *State v. Robinson* (1955), 162 Ohio St. 486, 55 O.O. 388, 124 N.E.2d 148. In addition, a conviction based on legally insufficient evidence constitutes a denial of due process. *Tibbs v. Florida* (1982), 457 U.S. 31, 45, 102 S.Ct. 2211, 2220, 72 L.Ed.2d 652, 663, citing *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.

"Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. *Robinson, supra,* 162 Ohio St. at 487, 55 O.O. at 388–389, 124 N.E.2d at 149. Weight of the evidence concerns 'the inclination of the *greater amount of credible evidence,* offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief.'* (Emphasis added.) Black's, *supra,* at 1594.

"When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony. *Tibbs,* 457 U.S. at 42, 102 S.Ct. at 2218, 72 L.Ed.2d at 661. See, also, *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 219, 485 N.E.2d 717, 720–721 ('The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.')." *Id.* at 386–387, 678 N.E.2d at 546–547.

For appellant to be convicted of aggravated murder pursuant to R.C. 2903.01, the state was required to prove that appellant both "purposely" and with "prior calculation and design" caused the death of Stiert. R.C. 2903.01(A). A person acts "purposely" when "it is his specific intention to cause a certain result." R.C. 2901.22(A). If a person causes the death of another "purposely," and *not* with "prior calculation and design," the offense is murder. R.C. 2903.02.

In the present case, the state presented the following evidence to support its theory that appellant committed aggravated murder. Officer Steven Warrick of the Columbus Division of Police testified that when he arrived at the homicide scene at approximately 4:50 a.m, he first spoke with a "distraught" woman, Karen Lucas, who was sitting on the porch. Lucas described the suspect as a black male, five feet five inches tall and one hundred sixty pounds, and who was known to her as "Lee." Although she provided a description of the suspect, Officer Warrick concluded that Lucas did not witness the shooting. Lucas also told him that there were four males downstairs at the time of the shooting.

Officer Warrick stated that he found Stiert that morning inside the house sitting upright in a chair with a cigar in his mouth. Officer Warrick also testified that "[t]here was blood all over his body. * * * He appeared to be dead at that time." The officer stated that he found a handgun on a couch near where Stiert was seated.

Sergeant Larry Yates, a homicide detective, testified that at approximately 7:30 a.m., several hours after the shooting, he went to the home of appellant's mother, and ultimately found appellant hiding under a pile of clothes in an upstairs bedroom closet. Appellant was arrested and taken into custody for questioning. Appellant's mother went to the police headquarters to be with her son during questioning.

Detective William Snyder, a member of the Crime Scene Search Unit, testified that only one bullet had been fired from the .38–caliber revolver found on the couch, and five unspent bullets remained in the gun. The detective opined that Stiert was shot at close range and that the shooter was within three feet of the victim.

Shelly Slocum was the only witness called by the state who was at the scene at the time of the shooting. She testified that she became acquainted with appellant when he started selling "crack" cocaine to her approximately one year before the homicide. According to Slocum, appellant sold drugs out of the house where a woman named "Karen" (later identified as Karen Lucas) lived. Slocum eventually moved into that house because she had "no other place to go" because she was wanted by police on an escape charge and another warrant for a probation violation on a separate felony. She also stayed there "because of the drugs."

Slocum testified that on the Friday evening preceding the Saturday morning shooting, she arrived at the house at about 8:00 p.m. When she arrived, Karen, "a girl named Nicki," and appellant were there, and "like four or five other people that was purchasing stuff" were leaving. Slocum left to go to the store to get something for Nicki to eat. When she returned, Lee, Nicki, Karen and "Pinball Bill" (the decedent) were there.

When asked if appellant was selling drugs when she returned to the house, Slocum responded:

"He closed it down. * * * When I got back, he said I had to leave because he was closing the house down. Basically, he was—the impression I took was that him an[d] Nicki was spending the night together, and he was not selling drugs at that point, no."

According to Slocum, she saw appellant holding a handgun that night, prior to her going to the store. Slocum described how appellant and "Pinball" (Stiert) got along, in general:

"I think pretty well. I mean, it was more of a business relationship, as far as Bill would purchase what he wanted from Lee, or he would get credit from Lee and pay him back when he received his check. There was, I guess, a lot of disrespect on Lee's behalf, as far as how he would approach and speak to Bill, and he spoke to most everybody around very disrespectful."

Slocum then testified regarding her observations as to how appellant and the decedent were getting along the night of the homicide:

"When I first got back, the door was locked. I was supposed to be getting Nicki a sandwich. When I walked in, it seemed like I didn't—I mean, you could hear that they was talking, but an argument, the loudness broke out. Lee was standing with the gun in his hand. At first, it wasn't pointed, and he was disrespecting Pinball, calling him, you know—calling him a crackhead and an alcoholic and druggie, actually. Nicki, basically, supported what he was saying and calling him a pimp, motherf * * *, but supportive of what he was saying, basically, like to edge him on. Lee pointed the gun."

Slocum stated that Stiert had let her into the house, shut the door, and locked it, and that this argument continued as she walked back into the house. After Stiert told appellant that he should respect people in the house, appellant told Stiert that "he would blow his motherf * * * head off." Slocum stated that she did not know how or why this argument started. When asked how Stiert responded to appellant's name-calling, Slocum stated she thought that Stiert "just ignored him, basically," and that "Bill was a very passive type of person" who "took a lot of crap from people." She "guessed" that Stiert "was getting used to

the fact of Lee disrespecting him, so he, basically, sat down and blew it off." According to Slocum, appellant then:

"Continued to disrespect him and pointed the gun, and Lee had a habit—he's had other guns, and when Lee—he has pointed the guns at me before, playing, not the same gun but other guns, and he closed his eyes and would go like that, and point towards your face, and that's the position he took. And it was, basically—it happened so fast, I mean, the gun went off, and the first thing that came out of his [appellant's] mouth was [']Shelly, did I really do that?[']"

Slocum was asked to clarify what both appellant and Stiert were doing immediately before the gun went off:

"He [appellant] just said prior—before the gun went off, he told him he would blow his f * * * brains out that, you know, he ain't nothing but a f * * * crackhead, bitch, and within seconds the gun went off."

When asked whether that was the first time that appellant had said to Stiert that he would blow his brains out that night, Slocum testified that "[appellant] said it a couple of other times before it happened," and stated that appellant had said it "[t]hroughout the little confrontation they had when [she] first walked into the house."

Slocum further stated that before appellant fired the gun:

"Lee had his eyes closed, and he pointed the gun towards Pinball's head, which I didn't take seriously because he's done it before, but he continued—like, he continued to say, I will blow your f * * * brains out, and then the gun went off."

Slocum later reiterated her testimony that appellant was pointing the gun at Stiert's head with one eye closed and was telling Stiert that he was going to blow his brains out if he didn't shut up. She also stated that appellant had pulled the hammer on the gun back before he pulled the trigger, and she had never seen him pull back the hammer before when he would point guns at other people.

As to Stiert, Slocum said that he was:

"Sitting in a chair with his hands down by his side.

" * * *

"* * * Pinball was, more or less, blowing Lee off because Lee had carried on like that often, was getting ready to light a cigar. And after the gun went off, Pinball's head dropped, and blood came out of his nose and mouth, and his hands dropped to his side."

Slocum testified that Stiert was not making any threatening motions or threatening gestures toward Lee and that Stiert was "getting ready to light that

cigar. He was, basically, ignoring Lee when [Lee] started to carry on his usual serenade about calling people bitches and crackheads, et cetera."

After shooting Stiert, appellant repeated "Did I really do that, Shelly?" and asked what he should do. According to Slocum, she told them (appellant and Nicki) "to run." Slocum then left as well. She stated that she was the only eyewitness to the actual shooting and that Nicki could not have seen the shooting because she was at an angle and behind appellant.

Slocum went to a friend's house, arriving at some time between 2:30 and 4:00 a.m. According to Slocum, appellant called her at this friend's house, and asked her if she was "going to tell on him." She told him that she would not tell on him and did not want to get involved, particularly since she was "an escapee." When asked if appellant ever claimed that this was an accident, Slocum testified that he told her during this phone conversation that "he didn't mean it."

On cross-examination, Slocum acknowledged that appellant and Stiert often "got along pretty well." She testified that Lee disrespected a lot of people and that Lee wasn't being angry when he would act in this manner toward Stiert. She also recalled that she told Detective Paley during an earlier interview that the gun used in the shooting was originally brought into the house and left there early that evening by a Billy Firman or Furnan. When defense counsel played an audiotape of an interview she had with the police, Slocum admitted that she initially told Detective Paley that the shooting "was an accident, truly an accident." She then testified that she did not really know whether the shooting was an accident and that at the time of her statement to the police she felt pressure by the neighborhood and appellant's friends to not be a "snitch."

Detective Paley testified that he interviewed appellant several hours after the shooting. The interview was videotaped, and the tape was played for the jury. During the course of the interview, appellant provided differing, confusing versions of the events leading up to the shooting. Appellant initially told the detective that someone at the house told appellant to hold the gun for him, and appellant agreed to. He described the shooting as accidental, giving the following details:

"* * * [A]nd one of my friends, he had a gun, but he let the dude—you know what I am saying that happened—he let him hold the gun, but the dude told me, you know, I want you to hold it. I don't know you like that. So I said, Okay.

"So I stood there in my chair and the dude [William 'Pinball' Stiert] started playing with the gun, so I told him, man, I grabbed the gun, put it back on the table and told him don't do that. So he started fussing with me and started talking—you know * * *. So I told him, he had to chill out.

"So he came back in, sat on the chair, started talking loud to me, and he just got up, man. And I knew he was going for it because I kept taking it away from him. And as soon as I grabbed it, he just grabbed it, man, and boom, just like that, man, just—he did something with his finger or something, and—

" * * *

"I swear he did, man. I never would have killed my friend like that, man. I have known him for awhile. His name was Pinball. He was a nice dude, man. He ain't never did nothing wrong to me, and I swear, man, I did not mean to do that, man. You know what I am saying.

"I don't want him to take the gun, though, not telling what he would have done to me. He probably would have done something to me at the same time I was trying to take it away from him, but he wanted * * * grab the gun, and I am up here, grabbing it away from him and, you know, * * * the trigger is right there and boom, he just stood back in his chair, just like this.

"So that's what happened. It wasn't like he was out of hand and I was drinking and I just shot him. Oh, man, it's not like that."

Appellant denied that the gun belonged to him and said that it belonged to a friend of Pinball's. According to appellant, this friend left the house to go to a nearby bar and told Pinball to hold the gun for him. Pinball then gave the gun to appellant. When appellant told him that he did not want to take the gun because he "[didn't] know the dude," that is "when everything started." Appellant said that Pinball was "pissy drunk" by then.

Notwithstanding the detective's continual accusations that appellant was lying, appellant initially, and vehemently, denied bringing the gun to the house, "smoking crack" shortly before the shooting, or purposely shooting Stiert because he made him mad. However, appellant eventually made a statement suggesting that whoever gave him the gun did so outside the house, and then appellant brought the gun in the house but did not show it to anyone.

Appellant offered somewhat different accounts of the shooting itself:

"Pinball was tripping, man. Listen, I did not shoot him * * *. I did not pull the trigger. * * * He got up and slapped the gun and it slipped up, * * * and hit the trigger and just hit the floor "

When asked to clarify, appellant said that Stiert's finger pushed appellant's finger into the trigger when appellant tried to move the gun away from him.

Appellant also claimed that Stiert picked up the gun from the couch or a table and cocked it, and then Stiert set it back down and picked it back up. Then, appellant took the gun from Stiert and placed it on a table. Appellant went outside to get a soda. When he returned, Stiert was talking "all crazy and stuff,"

causing appellant to grab the gun. When Stiert swung his hand while appellant was trying to grab the gun, Stiert smacked the gun and it went off. Appellant had forgotten that the gun was cocked.

Although appellant initially denied having an argument with Stiert, appellant did eventually concede that there was some argument after appellant made a comment about Stiert's girlfriend, which made Stiert mad. The argument apparently escalated, appellant stating that Stiert threatened to "whip [appellant's] ass." The two exchanged shoves and sparred verbally, appellant asking Stiert if he wanted to "whip [appellant's] ass." When Stiert replied "I bet I will," appellant grabbed the gun from under the couch. Stiert told him he was "nothing," and appellant told him to "get out of [his] face" or appellant would shoot him in the leg and make him a cripple. That was all appellant said before Stiert grabbed the gun and it somehow went off.

The final version of appellant's story as told to Detective Paley was that appellant concluded that Stiert actually shot himself after swiping the gun away from the couch. Appellant stated that Stiert had "cocked the hammer and put * * * it on the couch." Stiert said that he would "whip [appellant's] ass," and appellant replied "I will shoot you, motherf * * *." Stiert then "swiped" the gun off the couch and shot himself during the struggle.

Appellant, age sixteen at the time of trial, testified on his own behalf. According to appellant, a friend of Stiert's brought the gun to the house and gave it to Stiert. The gun was placed on the coffee table. He testified as follows regarding his recollection of the shooting itself:

"Well, it was like I was asleep, and I * * * fell asleep for, like a half hour, and then * * * I woke up, and I seen a gun on the table, and Harlene ['Nicki'] Sammons was in front of the window—I mean, the door, and she was sitting there saying she needed some air. So I woke up, and I was just * * * I wasn't in my right state of mind. * * * I got up and I seen him sleeping in the other chair with his legs across, and I was, like, I might go home.

"So I got up, and I * * * woke him up and said, here's your gun, and he took a cigar in his mouth and told me to give it to him. So I handed him his gun, and that gun accidentally discharged."

Appellant explained, essentially, that his previous statement to the police was inconsistent and often conflicting because he was scared, confused, and in a state of shock after accidentally killing his friend.

As noted *infra*, the state was required to prove "prior calculation and design," an element entirely independent of and distinct from the less stringent "purposely," in order to sustain an aggravated murder conviction under circumstances such as those presented here. In *State v. Taylor* (1997), 78 Ohio St.3d 15, 676

N.E.2d 82, the Supreme Court of Ohio addressed at length the history and meaning of "prior calculation and design":

"Under former R.C. 2901.01, 'murder in the first degree,' aside from murder by poison or felony murder, required proof of 'deliberate and premeditated malice.' See *State v. Stewart* (1964), 176 Ohio St. 156, 27 O.O.2d 42, 198 N.E.2d 439. Effective January 1, 1974, the General Assembly reclassified first-degree murder as 'aggravated murder' and substituted a requirement of 'prior calculation and design' to replace the more traditional 'deliberate and premeditated malice.' * * * See *State v. Jenkins* (1976), 48 Ohio App.2d 99, 2 O.O.3d 73, 355 N.E.2d 825. R.C. 2901.01(A), amended in 1981, retained the term 'prior calculation and design' as a necessary element of aggravated murder. * * *

"According to the 1973 Technical Committee Comment to Am.Sub.H.B. No. 511, a Legislative Service Commission summary, R.C. 2903.01 'restates the former crime of premeditated murder so as to embody the classic concept of the planned, cold-blooded killing while discarding the notion that only an instant's prior deliberation is necessary.'

" * * *

"In *State v. Cotton* (1978), 56 Ohio St.2d 8, 10 O.O.3d 4, 381 N.E.2d 190, at paragraph one of the syllabus, we agreed that ' "*prior calculation and design* " *is a more stringent element* than the "deliberate and premeditated malice" which was required under prior law.' The General Assembly's apparent intention 'was to require more than the few moments of deliberation permitted in common law interpretations of the former murder statute, and to require a scheme designed to implement the calculated decision to kill.' *Id.,* 56 Ohio St.2d at 11, 10 O.O.3d at 6, 381 N.E.2d at 193. Also, in *Cotton,* at paragraph two of the syllabus, we held that '[i]nstantaneous deliberation is not sufficient to constitute "prior calculation and design." ' " (Emphasis added.) *Id.* at 18–19, 676 N.E.2d at 88–89; see, also, *State v. Awkal* (1996), 76 Ohio St.3d 324, 330, 667 N.E.2d 960, 967.

In *Taylor, supra,* the Supreme Court of Ohio acknowledged that Ohio courts, including itself, have upheld findings of prior calculation and design in "some short-lived emotional situations other than the Technical Committee's 'classic' concept of the 'planned, cold-blooded killing,' " citing *State v. Claytor* (1991), 61 Ohio St.3d 234, 574 N.E.2d 472 ("encounter with unarmed Veterans Administration guards and pursuit of wounded guard"); *State v. Robbins* (1979), 58 Ohio St.2d 74, 12 O.O.3d 84, 388 N.E.2d 755 ("after argument and assault, defendant retrieved weapon and stabbed neighbor"); and *State v. Toth* (1977), 52 Ohio St.2d 206, 6 O.O.3d 461, 371 N.E.2d 831 ("accused and victim encountered each other in several bars in one evening"). *Taylor,* at 19–20, 676 N.E.2d at 88–89. However, the *Taylor* court also acknowledged numerous instances where courts have declined to uphold findings of prior calculation and design in "explosive, short-

duration situations," citing *State v. Reed* (1981), 65 Ohio St.2d 117, 19 O.O.3d 311, 418 N.E.2d 1359 ("after a botched theft, accused shot pursuing civilian and police officer"); *State v. Mulkey* (1994), 98 Ohio App.3d 773, 649 N.E.2d 897 ("street-gang attack on victim"); and *State v. Davis* (1982), 8 Ohio App.3d 205, 8 OBR 276, 456 N.E.2d 1256 ("excluded patron shot bar owner and doorman"). *Taylor*, at 20, 676 N.E.2d at 89.

■ Ultimately, *Taylor* concludes that "it is not possible to formulate a bright-line test that emphatically distinguishes between the presence or absence of 'prior calculation and design' " and that, "[i]nstead, each case turns on the particular facts and evidence presented at trial." *Id.* · Accordingly, the third assignment of error first requires us to determine whether the state produced evidence that sufficiently proved, beyond a reasonable doubt, that appellant acted both "purposely" and with "prior calculation and design" in killing Stiert.

Based upon our careful consideration of the fact-driven case law, and construing the evidence in favor of the prosecution, as is required in a sufficiency analysis, we are compelled to find that a reasonable jury could have found that the prosecution sufficiently proved the "prior calculation and design" element beyond a reasonable doubt.

The testimony of the state's primary witness and the only eyewitness, Shelly Slocum, indicates that the events did not happen in an "explosive, short-duration" situation with only an "instant's" or a "few moments of" prior deliberation. Her testimony indicates that (1) the confrontation between appellant and Stiert continued for some amount of time and was not an "explosive, short-duration" situation, (2) appellant was holding the gun during the entire confrontation and did not merely grab it in anger at the last moment, (3) during the continuing confrontation, appellant told Stiert repeatedly that "he would blow his motherf * * * head off," (4) before appellant fired the gun, appellant closed one eye, aimed the gun toward Stiert's head, and continued to say he would blow Stiert's brains out if he didn't shut up, and (5) appellant pulled the hammer on the gun back before he pulled the trigger.

· Further, there is no indication that Stiert was escalating the argument or doing anything to provoke appellant emotionally. Slocum stated that Stiert "just ignored [appellant]" and "basically, sat down and blew it off," and that "Bill was a very passive type of person." Also, Stiert was sitting in a chair with his hands down by his side and was not making any threatening motions or threatening gestures toward appellant.

In addition, although Slocum initially told Detective Paley that "the shooting was an accident, truly an accident," she testified that she did not really know whether the shooting was an accident and that at the time of her statement to the

police she felt pressure by the neighborhood and appellant's friends to not be a "snitch."

The Supreme Court of Ohio recently examined "prior calculation and design" in *State v. Goodwin* (1999), 84 Ohio St.3d 331, 703 N.E.2d 1251. In *Goodwin,* the defendant fatally shot a store owner while robbing a store. The court found that there was sufficient evidence to find prior calculation and design on behalf of the defendant because (1) defendant placed his gun to the forehead of a cooperative and unresisting victim who at that moment had been standing with his arms raised above his head, (2) at that time, appellant pulled the trigger, causing the bullet to enter the left forehead and exit the other side, killing the store owner instantly, (3) the action required thought on the defendant's part to place the gun, at the victim's forehead, (4) it took additional time for defendant to decide to pull the trigger, and (5) it was not a "spur-of-the-moment" shooting. The Supreme Court found that sufficient time, reflection, and acts were involved to provide the necessary thought processes that the law requires for a finding of prior calculation and design.

We find the facts in *Goodwin* compelling in our determination in the present case. In the current case, appellant aimed his gun at Stiert, who was unthreatening and unresisting and who at that moment had been sitting with his arms to his side. After raising the gun, appellant also took the additional steps to cock the hammer, close one eye, and pull the trigger, which required thought on the part of appellant. Further, it took additional time for appellant to decide to pull the trigger. The circumstances also indicate that because there was an ongoing confrontation for some period of time and appellant threatened Stiert numerous times that he would blow his head off before actually shooting, this was not a "spur-of-the-moment" shooting. Thus, as in *Goodwin,* we find that sufficient time, reflection, and acts were involved to provide the necessary thought processes that the law requires for a finding of prior calculation and design.

Accordingly, we also find that there was sufficient evidence as to the "purposeful" nature of appellant's actions. The evidence in this case demonstrates that any rational trier of fact could have found that appellant murdered Stiert purposely with prior design and calculation. Therefore, we find that there was sufficient evidence to find appellant guilty of aggravated murder beyond a reasonable doubt.

■ Appellant also argues in this assignment of error that the trial court's decision was against the manifest weight of the evidence. In addressing the sufficiency of the evidence, we already discussed much of the evidence presented by the prosecution. Appellant's version of the facts was presented by way of a videotaped interrogation of appellant and appellant's own testimony at trial.

20

Obviously, appellant gave numerous conflicting accounts as to how the shooting occurred. The most damaging version of the facts suggests that appellant initiated the name-calling and "disrespect," and that the two men exchanged shoves and sparred verbally, with appellant eventually grabbing the gun from under the couch and telling Stiert "to get out of [his] face" or he would shoot him in the leg and make him a cripple. Although appellant testified that the gun went off accidentally thereafter, the jury certainly could have found appellant's testimony regarding how the actual shooting occurred not credible due to the conflicting statements presented during the interrogation and his testimony at trial. Further, the jury could have reasonably found the testimony of the only eyewitness, Slocum, credible in finding that appellant had shot Stiert purposely with prior calculation and design.

After reviewing the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of witnesses, we find that the jury did not clearly lose its way and create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Importantly, we find that the evidence does not "weigh heavily against the conviction," and thus, the aggravated murder conviction was not against the manifest weight of the evidence. For the reasons set forth above, the finding that appellant acted "purposely" was also not against the manifest weight of the evidence.

Based upon the foregoing, the third assignment of error is overruled. The judgment of the trial court finding appellant guilty of aggravated murder is affirmed.

In appellant's second assignment of error, appellant contends that the trial court committed prejudicial error in denying his motion *in limine* in which he sought to exclude certain "other acts" evidence. Specifically, appellant challenges the trial court's allowance of testimony regarding his involvement in the sale and use of illegal drugs prior to the murder.

We are bound by an abuse of discretion standard in reviewing the admission or exclusion of evidence. *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus. In order to find an abuse of that discretion, a trial court's decision must be deemed "unreasonable, arbitrary or unconscionable." *State v. Cherry* (1995), 107 Ohio App.3d 476, 479, 669 N.E.2d 45, 47.

Evid.R. 404(B) provides:

"Evidence of the other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive,

opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Evid.R. 404(B).

Similar exceptions to the general prohibition against "other acts" evidence are codified in R.C. 2945.59.

 The trial court allowed the testimony based upon a conclusion that the prior bad acts, drug dealing, were admissible for the purposes of proving a "scheme or plan" and "to form part of an immediate background of the alleged act." The trial court relied upon *State v. Wilkinson* (1980), 64 Ohio St.2d 308, 18 O.O.3d 482, 415 N.E.2d 261, wherein the Supreme Court of Ohio held:

"The 'scheme, plan or system' provision contained within R.C. 2945.59 permits the introduction in evidence of testimony concerning other acts which 'form part of the immediate background of the alleged act which forms the foundation of the crime charged in the indictment.' (*State v. Curry,* 43 Ohio St.2d 66, 72, 72 O.O.2d 37, 41, 330 N.E.2d 720, 725, approved and followed.)" *Id.* at paragraph two of the syllabus.

*Wilkinson* does not provide authority for the admission of the other-acts testimony in this case, as the testimony pertaining to drugs did not establish the requisite "scheme, plan or system," much less "the immediate background" forming the "foundation" for the murder itself. *Wilkinson,* quoting *State v. Curry* (1975), 43 Ohio St.2d 66, 73, 72 O.O.2d 37, 41, 330 N.E.2d 720, 725, explains:

" 'Scheme, plan or system' evidence is relevant in two general factual situations. First, those situations in which the 'other acts' form part of the immediate background of the alleged act which forms the foundation of the crime charged in the indictment. *In such cases, it would be virtually impossible to prove that the accused committed the crime charged without also introducing evidence of the other acts.* To be admissible pursuant to this subcategory of 'scheme, plan or system' evidence, the 'other acts' testimony *must concern events which are inextricably related to the alleged criminal act."* (Emphasis added.)

Inarguably, the record fails to show that the testimony pertaining to drugs concerned events "inextricably related" to the murder. At best, appellant's use and/or sale of drugs merely offers some explanation as to why those persons involved were in the house. Post-*Wilkinson* cases clarify the issue and support this conclusion. In *State v. Smith* (1990), 49 Ohio St.3d 137, 551 N.E.2d 190, the Supreme Court of Ohio applied *Wilkinson* as follows:

"This court has examined admissibility of 'other acts' evidence in a number of decisions. We have stated the general rule to be 'that in a criminal trial evidence of previous or subsequent criminal acts, *wholly independent of the offense for*

*which a defendant is on trial, is inadmissible.'* State v. Wilkinson (1980), 64 Ohio St.2d 308, 18 O.O.3d 482, 415 N.E.2d 261.

"Exceptions to this general rule have been limited by R.C. 2945.59 and Evid.R. 404(B) to instances *where the probative value of the evidence is sufficient to allow its admission.*" (Emphasis added.) *Id.* at 139, 551 N.E.2d at 192.

On the same date it released *Smith,* the Supreme Court of Ohio rendered another "other acts" case specifically addressing the "plan" and "identity" exceptions to the general rule. In *State v. Jamison* (1990), 49 Ohio St.3d 182, 552 N.E.2d 180, the court held:

"Other acts forming a unique, identifiable plan of criminal activity are admissible to establish identity under Evid.R. 404(B). *To be admissible these other acts must tend to show by substantial proof* 'identity' or other enumerated purposes under Evid.R. 404(B). Although the standard for admissibility is strict, the other acts need not be the same as or similar to the crime charged." (Emphasis added.) *Id.* at the syllabus.

A careful review of the record does not show that the drug use or trafficking "tend[ed] to show" a plan or scheme inextricably linked to the murder. There is absolutely no evidence that even suggests that the argument between appellant and the victim, and the ensuing shooting, was related to appellant's use and/or sale of drugs. We cannot agree with the state's conclusory statement that the drug-related evidence somehow tended to show the "absence of accident." The objectionable testimony pertained to various drug transactions that occurred on dates and times prior to the actual murder, did not necessarily involve the victim, and did not involve guns.

In summary, because the state failed to prove any relevant relationship between the drug transactions and the murder, none of the Evid.R. 404(B) or R.C. 2945.59 exceptions apply.

■ Having determined that the admission of the testimony in question was error, we must determine whether the error was prejudicial or harmless. *State v. Davis* (1975), 44 Ohio App.2d 335, 343, 73 O.O.2d 395, 399, 338 N.E.2d 793, 800. "In so determining, the court must review the entire record, disregarding the objectionable material, and determine whether there was otherwise overwhelming evidence of the appellant's guilt." *State v. Woods* (1988), 48 Ohio App.3d 1, 5–6, 548 N.E.2d 954, 960. If the court finds overwhelming evidence of the appellant's guilt aside from the disputed material, then it must hold that the error was not prejudicial and harmless beyond a reasonable doubt, and affirm the trial court. *Davis, supra,* at 344, 73 O.O.2d at 400, 338 N.E.2d at 801.

 We have carefully reviewed the record before us as a whole, disregarding the references to appellant's alleged involvement in drug dealing, and conclude that the record demonstrates overwhelming evidence of appellant's guilt aside from the disputed evidence. Accordingly, any error in allowing the testimony was harmless beyond a reasonable doubt. Appellant's second assignment of error is overruled.

Turning to his final argument, appellant's first assignment of error contends that the trial court erred in denying his pretrial motion to suppress evidence. Specifically, appellant contends that the trial court erred in admitting into evidence his videotaped statement made to police while in custody hours after the incident. In the course of this statement, appellant confessed to shooting the victim. Appellant submits that there was no voluntary and intelligent waiver of his constitutional privilege against self-incrimination under *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

 The test to be applied in analyzing a juvenile's confession is set forth in paragraph one of the syllabus to *In re Watson* (1989), 47 Ohio St.3d 86, 548 N.E.2d 210:

"In deciding whether a juvenile's confession is voluntarily induced, the court should consider the totality of the circumstances, including the age, mentality and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; and the existence of physical deprivation or inducement. (*State v. Edwards* [1976], 49 Ohio St.2d 31, 3 O.O.3d 18, 358 N.E.2d 1051 [vacated in part on other grounds (1978), 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155], approved and followed.)"

 In reviewing a trial court's ruling on a motion to suppress, an appellate court must accept the trial court's factual findings if they are supported by competent, credible evidence, and must independently determine as a matter of law whether the facts meet the "voluntariness" standard. *State v. Guysinger* (1993), 86 Ohio App.3d 592, 594, 621 N.E.2d 726, 727. In applying the *Edwards* standard above, the Supreme Court of Ohio has stated that a confession is "involuntary and violative of the United States and Ohio Constitutions if it is the product of 'coercive police activity.' " *State v. Loza* (1994), 71 Ohio St.3d 61, 66, 641 N.E.2d 1082, 1094, quoting *Colorado v. Connelly* (1986), 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473, 484.

Appellant argues that his confession was not voluntary based upon the totality of the following circumstances surrounding his interrogation: (1) he was fifteen years old at the time, (2) he had been awake for approximately twenty-four hours prior to questioning, (3) he was held in a very small cell for approximately one hour, (4) he had just witnessed the accidental shooting of his friend, (5) he had

run approximately seven miles to his home immediately after the shooting, (6) he was subject to interrogation "in a very loud tone" which included allegations that he was lying, (7) his mother assisted the police in "berating" him during the interrogation; and (8) both appellant and his mother were visibly upset during the interview.

Applying the standards set forth above, we find that the trial court's factual findings are supported by competent, credible evidence and, further, that these facts satisfy the voluntariness standard.

Columbus Police Detective Philip Paley interviewed appellant at approximately 8:45 a.m., about five hours after the shooting. Because appellant was a juvenile, he arranged for appellant's mother to be present. Appellant indicated that he wanted to tell his version of what happened. At the outset, the detective reviewed a *Miranda* rights waiver form with both appellant and his mother. Then, appellant read aloud the second paragraph, the waiver language of the form. Appellant's mother read aloud the "parent" portion of the waiver form. After both appellant and his mother indicated that they understood appellant's rights, they both signed the waiver.

Appellant appeared to be in command of his faculties. He indicated that he was not under the influence of alcohol or drugs. He had completed the ninth grade and was currently in the tenth. He stated that he averaged "B's" and "C's" in school. The videotape fails to demonstrate that he was subjected to deprivation, mistreatment or harsh conditions, nor was he threatened or promised anything. Neither the length (approximately one hour) nor the intensity of the interrogation was unreasonable.

While the issue of whether a confession is voluntary is a question of law for the court, the fact finder determines "whether the manner in which the confession was obtained casts doubts on its credibility." *Loza, supra,* 71 Ohio St.3d at 65–66, 641 N.E.2d 1082, citing *Crane v. Kentucky* (1986), 476 U.S. 683, 689, 106 S.Ct. 2142, 2146, 90 L.Ed.2d 636, 644. As explained in *Loza,* a videotape enables the jury to consider the credibility and weight of the confession:

"They could see and hear the tone and manner of the interrogation, the number of officers present, the physical characteristics of the room, and the length of the interrogation. The jury had the opportunity to evaluate the credibility of the appellant and to give the confession its appropriate probative weight. See *State v. Jamison* (1990), 49 Ohio St.3d 182, 191, 552 N.E.2d 180, 189 (the weight to be given evidence and the credibility of witnesses are jury issues)." *Id.* at 66, 641 N.E.2d at 1093.

Thus, defense counsel was free to challenge, as he did, the credibility and weight to be given to appellant's statement, his first version of the events, under the circumstances at the time he provided the statement.

Appellant's first assignment of error is overruled.

Accordingly, appellant's assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

LAZARUS, P.J., concurs.

TYACK, J., concurs in part and dissents in part.

TYACK, Judge, concurring in part and dissenting in part.

I do not believe that the evidence presented in the trial court supports a finding of the existence of prior calculation and design. Therefore, I believe that Mardis should only have been convicted of murder, not aggravated murder.

Mardis gave numerous conflicting accounts as to how the shooting occurred. His lack of credibility notwithstanding, the state's primary witness and only eyewitness, Shelly Slocum, testified that the entire incident occurred almost instantaneously. Mardis went from mouthing-off and name-calling, which was characteristic behavior for him, to pulling the trigger in a matter of seconds–according to the state's own witness. The most damaging "version" of the facts suggests that Mardis initiated the name-calling and "disrespect," and that Mardis and Stiert exchanged some hostile words and gestures at some point earlier in the evening, and then again immediately before the shooting. This evidence does not constitute proof that Mr. Mardis killed Stiert with "prior calculation and design."

I fear that the jury was affected in its finding of prior calculation and design by the many references to drug trafficking that apparently took place at the location where the shooting occurred. The fact that Mardis and Stiert had a relationship based upon drug use was not pertinent to the guilt or innocence of Mardis on a murder charge. This information should have been kept from the jury through the application of Evid.R. 403(A), which reads:

"(A) Exclusion mandatory. Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

As a result, I would sustain the second and third assignments of error in part. I would vacate the conviction for aggravated murder and remand the case for

sentencing on the lesser-included offense of murder. Since the majority does not do so, I respectfully dissent in part.