OPINION
{¶ 1} Defendant-appellant, Lawrence Williams, appeals from the judgment of the Franklin County Court of Common Pleas finding him guilty of two counts of aggravated murder, in violation of R.C. 2903.01(A), in connection with the shooting deaths of Anthony Edgerton and Charles Hughes.
 {¶ 2} According to the state's evidence, defendant and Shevelle Kiah were involved in a minor car accident in the parking lot near the Eaton Grove Apartments on Beluah Road in Columbus, Ohio, within approximately nine days before November 24, 2001. Defendant was driving a red Camaro and Kiah was driving a champagne Cavalier. Defendant agreed to pay for the repairs to Kiah's car and requested that Kiah not telephone the police or notify his insurance company. Kiah wrote defendant's name and license plate number down on a piece of paper. Kiah knew the defendant because he had been an inmate at the Pickaway Correctional Institution where Kiah had been employed as a corrections officer. As of November 24, 2001, Kiah had not heard back from defendant regarding the accident.
 {¶ 3} On the evening of November 24, 2001, several people gathered at the apartment of Melissa Cox who resided at 857 Eaton Grove Drive in Columbus, Ohio. In addition to Cox, her brother Charles "Ritchie" Hughes, his girlfriend Kiah, Anthony and Angel Edgerton, and Anthony's friends, Marcus Watkins and Kathy Wissinger. Apparently, everyone was drinking alcohol that evening and several of the witnesses testified that some of them were probably intoxicated. Kiah testified that, sometime that evening, she went to the apartment of Carla Boone where defendant had been staying. Kiah intended to ask defendant about paying for the damages to her car. Boone informed her that defendant was sleeping and Kiah returned to Cox's apartment. Later that evening, Kiah, Angel Edgerton, and Wissinger left to purchase more alcohol and cigarettes. According to their testimony, defendant's car was in one of the two parking lots by the apartment when they left. Upon their return, Kiah parked her car one space away from defendant's car. According to the testimony, defendant was in his car when the girls returned. Apparently, Hughes, Anthony Edgerton, and Watkins were somewhat upset that the girls had been gone for an extended period of time and the three men exited the apartment to talk to the girls upon their return. Watkins spoke with his girlfriend Wissinger and let her know that he was upset. Wissinger then went into the apartment to use the restroom. Anthony Edgerton and Hughes walked in the direction of defendant's car. According to the testimony, Hughes and Anthony Edgerton were under the impression that defendant had been talking to Kiah and Angel Edgerton and both men were upset about this. According to Kiah's and Watkins' testimony, Anthony Edgerton and Hughes approached defendant's car and began talking loudly with defendant regarding their belief that defendant had been talking to the girls. According to Kiah, she tried to explain to Hughes and Anthony Edgerton that defendant had not been bothering them and had not been trying to pick them up. However, Kiah was not able to calm the men down and defuse the situation. At the time that Hughes and Anthony Edgerton were yelling at defendant, Watkins was approximately 15 feet behind them watching what was going on. Kiah testified that, while she was standing beside defendant's car trying to calm down Hughes and Anthony Edgerton, she saw defendant reach for and pick up a silver colored gun. Kiah testified that she told defendant that the men were drunk and running their mouths. She told defendant, "Hey, whoa, whoa, hold up" (Tr. 593) and, as defendant tried to open his door, Kiah pushed it closed with her hip. Kiah hurried towards the apartment. At that time, according to Watkins' testimony, defendant exited his car, reached inside his jacket, and began shouting at Hughes and Anthony Edgerton repeating several times "I ain't playing, nigga, I ain't playing." (Tr. 731.) Thereafter, Watkins heard several gun shots being fired. As a result of the shooting, both Anthony Edgerton and Hughes were shot and killed. Neither Kiah nor Watkins actually saw defendant fire the shots.
 {¶ 4} Vincent Mathis, who resided at 2628 Beluah Road in Columbus, Ohio, testified that he observed a red Camaro matching the description of defendant's vehicle parked in his parking space near his apartment complex. Mathis had a conversation with a man whom he identified through a photo array and in court as defendant. In their conversation, Mathis told defendant that defendant needed to move the Camaro out of his parking space or it would be towed. According to Mathis's testimony, defendant told Mathis that he was having some car problems and, a short time later, defendant and his friends did move the Camaro out of Mathis's parking space.
 {¶ 5} The defense called several witnesses who testified that, on the night of the shootings, defendant was attending a birthday party for one of his children.
 {¶ 6} Following deliberations, the jury found defendant guilty on both counts of aggravated murder and, following the hearing regarding sentencing, the jury recommended that defendant be sentenced to life without parole. The trial court sentenced defendant to two life sentences without eligibility for parole in addition to two three-year terms of actual incarceration for the gun specification in both counts one and two.
 {¶ 7} Defendant has timely appealed and asserts the following two assignments of error:
 I. THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE DEFENDANT WHEN THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN A CONVICTION AND WAS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.
 II. THE TRIAL COURT VIOLATED DEFENDANT-APPELLANT'S CONSTITUTIONAL RIGHTS WHEN IT FAILED TO FOLLOW THE DICTATES OF BATSON V. KENTUCKY THEREBY DEPRIVING DEFENDANT-APPELLANT OF HIS RIGHT TO EQUAL PROTECTION AND TRIAL BY JURY.
 {¶ 8} In his first assignment of error, defendant contends that the state presented insufficient evidence to establish the element of "prior calculation and design" necessary to support his convictions for aggravated murder. Further, defendant argues that his convictions are against the manifest weight of the evidence.
 {¶ 9} In determining the sufficiency of the evidence, the function of the appellate court is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 10} The standard for determining whether a judgment in a criminal case is against the manifest weight of the evidence has been set forth by the Ohio Supreme Court in State v. DeHass (1967),10 Ohio St.2d 230, paragraph two of the syllabus which states:
 A reviewing court may not reverse a judgment of conviction in a criminal case in a trial court, where the record shows that a verdict of guilty was returned by a jury on sufficient evidence and where no prejudicial error occurred in the actual trial of the case or in the instructions given the jury by the court.
 {¶ 11} The test for whether the judgment is against the manifest weight of the evidence is broader than the test for whether there is sufficient evidence to support a conviction. In considering the manifest weight of the evidence, the reviewing court weighs the evidence in a limited sense to determine whether there is sufficient competent, credible evidence to permit reasonable minds to find the defendant guilty beyond a reasonable doubt. The syllabus rule of Jenks, which applies only to review of the sufficiency of the evidence, requires that the evidence be viewed in a light most favorable to the state. By comparison, a review of the manifest weight of the evidence does not require that the evidence be so viewed, but the ultimate test remains whether the result could reasonably be reached from the evidence. Where there is substantial evidence upon which the trier of fact has based its verdict, a reviewing court abuses its discretion in substituting its judgment for that of the jury as to the weight and sufficiency of the evidence. State v. Nicely (1988), 39 Ohio St.3d 147. Under both standards, an appellate court must ordinarily defer to the factfinder's resolution of factual and credibility issues. DeHass, supra.
 {¶ 12} R.C. 2903.01(A) defines the crime of aggravated murder, in pertinent part, as follows:
 No person shall purposely, and with prior calculation and design, cause the death of another * * *.
 {¶ 13} Although the phrase "prior calculation and design" is not defined in the Ohio Revised Code, the Supreme Court has interpreted the phrase to require proof of "more than the few moments of deliberation permitted in common law interpretations of the former murder statute, and to require a scheme designed to implement the calculated decision to kill." State v. Cotton (1978), 56 Ohio St.2d 8, 11. In State v. Taylor (1997), 78 Ohio St.3d 15, the court stated that it is "not possible to formulate a bright-line test that emphatically distinguishes between the presence or absence of `prior calculation and design.' Instead, each case turns on the particular facts and evidence presented at trial." Id. at 20. In Taylor, the court noted further as follows:
 This court has upheld findings of prior calculation and design in some short-lived emotional situations other than the Technical Committee's "classic" concept of the "planned, cold-blooded killing." * * * See, e.g., State v. Claytor (1991), 61 Ohio St.3d 234 * * * (encounter with unarmed Veterans Administration guards and pursuit of wounded guard); State v. Robbins (1979), 58 Ohio St.2d 74 * * * (after argument and assault, defendant retrieved weapon and stabbed neighbor); State v. Toth (1977), 52 Ohio St.2d 206 * * * (accused and victim encountered each other in several bars in one evening).
 At other times, Ohio courts (including this court) have declined to uphold findings of "prior calculation and design" in explosive, short-duration situations. See, e.g., State v. Reed (1981), 65 Ohio St.2d 117 * * *(after a botched theft, accused shot pursuing civilian and police officer); State v. Mulkey (1994), 98 Ohio App.3d 773
* * * (street-gang attack on victim); State v. Davis (1982), 8 Ohio App.3d 205 * * * (excluded patron shot bar owner and doorman).
Id.
 {¶ 14} Courts have identified three factors which are important in determining whether prior calculation and design exists: (1) whether the accused and victim knew each other, and, if so, whether that relationship was strained; (2) whether the accused gave thought or preparation to choosing the murder weapon or the murder site; or (3) whether the act was drawn out or whether it was an almost instantaneous eruption of events. (Citations omitted.)
 {¶ 15} Turning to the facts of the present case, this court notes that there is no evidence that the defendant knew either of his victims. Defendant knew Kiah, who was Hughes' girlfriend, and Hughes may have known that defendant had been involved in a minor traffic accident with Kiah. In any event, the evidence shows that, on the night of the shooting, defendant was sitting in his car and did not initiate a confrontation with the victims. However, the testimony of Kiah and Watkins demonstrates that, while Hughes and Anthony Edgerton were talking loudly with defendant for several minutes before the shooting, neither man threatened defendant in any manner. Kiah testified that she told Anthony Edgerton and Hughes that the defendant had not been trying to pick them up and that she tried to calm them down. Kiah also testified that, when she saw defendant reach for his gun, she told him that the situation did not need to go that far, that the two guys were just drunk and talking. Kiah testified further that, when defendant attempted to open his car door, she used her hip to bump it closed on more than one occasion while trying to tell defendant not to escalate the situation. However, despite her efforts, defendant exited the car, pulled his gun, yelled at the victims, and shot each of them several times. The evidence shows that defendant decided his course of action and, despite Kiah's efforts to stop him, defendant was determined to carry out his plan. Defendant then shot Hughes three times and Anthony Edgerton twice. Although the confrontation only lasted a few minutes, defendant proceeded to shoot his victims several times in spite of Kiah's efforts to stop him. This court finds that those facts weigh in favor of finding "prior calculation and design" and finds that the evidence was sufficient to support the convictions for aggravated murder under the language of the statute.
 {¶ 16} Defendant also contends that his convictions are against the manifest weight of the evidence.
 {¶ 17} Based upon review of the record, and given that the weight to be given the evidence and the credibility of witnesses are primarily for the trier of fact to decide, this court finds that defendant's convictions of aggravated murder could reasonably be reached from the evidence presented at trial. Although defendant's witnesses testified that he was at a birthday party for his child, none of those witnesses seemed particularly credible and they had large memory gaps concerning their ability to substantiate the testimony that they were absolutely certain that defendant was in a specific location at the time of the shootings. This court cannot say that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v. Thompkins (1997),78 Ohio St.3d 380.
 {¶ 18} For the foregoing reasons, this court finds that there was sufficient evidence to find defendant guilty of aggravated murder and this court likewise finds that his convictions were not against the manifest weight of the evidence. As such, defendant's first assignment of error is not well-taken and is overruled.
 {¶ 19} In his second assignment of error, defendant contends that the trial court violated his constitutional rights when it failed to follow the dictates of Batson v. Kentucky (1986), 476 U.S. 79,106 S.Ct. 1712, and deprived him of his right to equal protection and trial by jury. Defendant contends that, on two occasions, the state exercised peremptory challenges to excuse prospective jurors who were African-American.
 {¶ 20} Although defendant contends that the state exercised peremptory challenges to remove two African-American jurors, defendant's counsel only raised the Batson challenge with regards to one of those jurors. No challenge was made with regard to the second juror and, based upon the record before this court, it is not apparent whether the second prospective juror who was excused was African-American or not. Furthermore, in his brief, defendant only addresses the peremptory challenge exercised with regard to the juror defendant identifies as P.B. and that portion of the record which applies to her. In the absence of an objection, defendant has waived all but plain error with regard to the juror defendant identifies as R.G. and, based upon the record, this court finds no error. Crim.R. 52(B); State v. Long (1978),53 Ohio St.2d 91.
 {¶ 21} However, with regard to the juror identified as P.B., the record is clear that she was an African-American prospective juror who was excused by use of the state's peremptory challenge.
 {¶ 22} Purposeful racial discrimination in the selection of a jury panel violates a defendant's right to equal protection and denies a defendant the protection that a trial by jury is intended to secure. Batson, supra; Powers v. Ohio (1991), 499 U.S. 400, 111 S.Ct. 1364. The Supreme Court in Batson held that "[a]lthough a prosecutor ordinarily is entitled to exercise permitted peremptory challenges `for any reason at all, as long as that reason is related to his view concerning the outcome' of the case to be tried * * * the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant."
 {¶ 23} Pursuant to Batson, the burden rests with defendant to make a prima facie case of purposeful discrimination. The defendant is entitled to rely upon the fact that peremptory challenges are a jury selection method which allows those to discriminate who are of a mind to do so. The defendant must show that the facts and circumstances give rise to an inference that the prosecutor used his peremptory challenge to exclude a juror on the basis of race. Batson, at 95. Once the defendant establishes a prima facie case, the burden shifts to the prosecution to present a racial-neutral explanation for having peremptorily challenged African-American jurors. If a race-neutral explanation is provided, the trial court must then decide whether the defendant has proved purposeful racial discrimination. Hernandez v. New York (1991), 500 U.S. 352,111 S.Ct. 1859. Once the prosecutor has offered a race-neutral explanation for the peremptory challenge and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot. Id. at 359.
 {¶ 24} In the present case, the following exchange took place out of the hearing of the jury:
 MR. BEAL [Defense counsel]: Your Honor, I would like the record to reflect the juror that the Prosecutors just excused, [P.B.], is a female black Afro-American, and we raise a Batson challenge.
 THE COURT: Let's just get the ground rules straight here, so anybody can educate me, but it's my understanding that the Defense would need to show a prima facie case that the State is exercising its peremptory challenge for racial reasons. Once they have done that they have to put some race-neutral reason on the record. Are you suggesting you believe they have failed a prima facie and established that challenge for racial reasons?
MR. BEAL: Yes.
THE COURT: Explain that to me.
MR. NIEHOFF [Defense counsel]: Look at her. She's black.
 THE COURT: This Court does not feel that simply because the State exercised one peremptory challenge to a juror of color that that means that you have established a prima facie showing that they're doing it for racial reasons. I find no reason you need to justify that excuse. However, I give you the opportunity to state for race-neutral reasons on the record if you choose to.
 MR. LOWE [Prosecutor]: The reason that Ms. [B] was challenged was the first being on her questionnaire she indicated her grandson was charged with aggravated murder and I believe is in prison for that.
 Secondly, I believe Mr. Beal was associated with that case, and when she was questioned about it I just — I don't think she can put that aside that her grandson was charged with I believe capital murder. That's the sole reason — well, that's the sole topic Ms. [B] was challenged and nothing to do with her race or ethnicity in any way, just her grandson was charged with and Mr. Beal was associated with it. Our office obviously prosecuted it, and we just don't think she could put that aside and be fair in this case. It's the same kind of crime.
 MR. TERMUHLEN [Prosecutor]: I would ask the Court to agree with an observation that the first juror that we excused was a white female juror, and so we would like that to be part of the record in the context of whether this is a pattern that has been established.
Thank you, Your Honor.
THE COURT: I assume Defense agrees with that representation?
MR. BEAL: Yes.
MR. NIEHOFF: Yes, the first juror was white.
THE COURT: Any other record?
MR. LOWE: No.
MR. BEAL: No.
 THE COURT: So the record is perfectly clear, I don't think I need to rule on anything because I didn't find you made a prima facie showing. If, in fact, somebody later decides you have, I'm wrong on that point then. My ruling is overrule the Batson objection.
(Tr. 129-131.)
 {¶ 25} In the present case, the trial court found that the prosecution's explanation for exercising its peremptory challenge against juror P.B. was race neutral and that the defendant had not shown that the prosecution was excluding that juror solely based upon her race. The reason articulated by the prosecutor was race neutral and could be viewed as a legitimate concern. Although defendant argues that, once the prosecution offered its rationale, defense counsel should have been permitted to rebut those reasons and show pretext; the case law does not include such a requirement. Instead, this court finds that the trial court followed the dictates of Batson and its progeny and defendant's second assignment of error is not well-taken and is overruled.
 {¶ 26} Based on the foregoing, this court overrules defendant's assignments of error and the judgment and conviction of the Franklin County Court of Common Pleas finding defendant guilty of two counts of aggravated murder is affirmed.
 Judgment affirmed.
WATSON and DESHLER, JJ., concur.