[Cite as *State v. Sekulic*, 2017-Ohio-4259.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
|---|---|---|
| STATE OF OHIO | : | Hon. W. Scott Gwin, P.J. |
|  | : | Hon. William B. Hoffman, J. |
| Plaintiff-Appellee | : | Hon. John W. Wise, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 2016CA00135 |
| DRAGAN SEKULIC | : |  |
|  | : |  |
| Defendant-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:     Criminal appeal from the Stark County
Court of Common Pleas, Case No.
2015CR1884

JUDGMENT:                                  Affirmed

DATE OF JUDGMENT ENTRY:       June 12, 2017

APPEARANCES:

For Plaintiff-Appellee                    For Defendant-Appellant

JOHN D. FERRERO                       AARON KOVALCHIK
STARK COUNTY PROSECUTOR      116 Cleveland Avenue N.W.
BY: RENEE WATSON                      808 Courtyard Centre
110 Central Plaza S., Ste. 510        Canton, OH 44702
Canton, OH 44702

*Gwin, P.J.*

{¶1}    Defendant-appellant Dragan Sekulic ["Sekulic"] appeals from the July 6, 2016 judgment entry of the Stark County Court of Common Pleas convicting and sentencing him for one count of Aggravated Murder in violation of R.C. 2903.01(A) with a firearm specification in violation of R.C. 2941.145, one count of Attempted Murder in violation of R.C. 2923.02(A), and one count of Felonious Assault in violation of R.C. 2903.11(A)(2).

*Facts and Procedural History*

{¶2}    Sekulic came to the U.S. from Croatia with his parents around 1980.  In 2001, he was introduced to Zeljka through family members.  Zeljka was living in Serbia at the time.  The two talked over the phone for a period before Sekulic traveled to Serbia with the intention of marrying Zeljka.  They married in Serbia in September 2001, and Zeljka came to the United States shortly thereafter.  The two settled in Stark County and had two daughters.

{¶3}    During the course of her marriage, Zeljka pursued an STNA nursing degree.  Eventually she took jobs at various nursing homes, working full time at the Astoria Nursing Home and part-time at three other nursing homes.

{¶4}    In December 2014, Zeljka and Sekulic separated and began divorce proceedings.  Zeljka and her two daughters moved in with Zeljka's sister, Stanislava "Stan" and her two children.  The divorce became final in August 2015.

{¶5}    On November 22, 2015, Sekulic had the children for visitation. Subsequent to the divorce, Sekulic wished to retrieve the cell phone that was in his name from Zeljka.  He asked his youngest daughter to bring him Zeljka's old cell phone.

{¶6}     Later, Sekulic accessed Zeljka's Facebook account, went through her messages, and discovered that she was intimately involved with an African-American co-worker.  Believing the relationship began before they divorced, Sekulic immediately told his daughters, age 9 and 13, "mommy cheated on me."  He then let them read the intimate, graphic messages.

{¶7}     When the children went home the next day and Zeljka learned what Sekulic had done, she was furious.  She told Sekulic he would not see the children for Thanksgiving.

### November 24, 2015 – Attempted murder and Felonious assault.

{¶8}     On November 24, Sekulic phoned Zeljka 40-50 times.  When she blocked his number, he decided he would follow her to work.  When Zeljka pulled into the Astoria parking lot, Sekulic pulled in next to her.  She was on the phone.  He got out of his half-ton Chevy pickup and attempted to break the passenger side window of Zeljka's Chrysler 2000 with his cell phone charger or adapter.  Terrified, Zeljka drove off.  Sekulic jumped back into his truck and followed.

{¶9}     Zeljka began driving in circles around the perimeter of the Astoria parking lot at a high rate of speed with Sekulic in pursuit.  At the same time, she was on the phone with 9-1-1, for help.  Zeljka told the dispatcher her husband had followed her to work, was chasing her in her car with his Chevy Silverado, she believed that he had a gun, and was going to kill her.

{¶10}   At the same time, Lindsay Conant, an employee at a memory care facility situated next door to the Astoria, had just stepped outside with two clients for a smoke

break.  She had a clear view of the Astoria parking lot.  Shonna Keys was also present in the Astoria parking lot, having arrived to visit a patient.

{¶11}   Conant watched as the two vehicles sped around the lot.  Both the women watched as Sekulic charged toward the back of Zeljka's car at "highway speed" and rammed the back end.  The car was pushed through the parking lot, out into the street and into a utility pole.  The pole snapped in half.  Zeljka's car then continued across the street, struck a building, and landed upside down, trapping her inside.  Conant watched Sekulic ram the car a few more times, and then speed away.

{¶12}   Sekulic fled to a friend's house and called his brother, Gligo.  He told Gligo what he had done, told him he had disposed of the gun in a lake, and asked him to come and pick him up.  Gligo refused and told Sekulic to turn himself in to the police.

{¶13}   Sekulic also called his friend James Lamtman.  He told Lamtman he had rammed Zeljka's car and disposed of the gun he had used to try to break her car window. He further shared he had been drinking and was going to wait until he sobered up to turn himself in to the police.  Lamtman told Sekulic not to wait.  Sekulic took his advice.

{¶14}   Sekulic was taken into custody, but then released on bond.  For the following fifteen days, Gligo saw his brother every day.  Gligo noted that his brother remained angry with Zeljka and obsessed with her new relationship.  Gligo encouraged Sekulic to put it behind him and move on with his life.  On the evening of December 8, 2015, Sekulic helped Gligo at his landscaping shop.  Gligo expected Sekulic back the following morning to work.

{¶15}   During the same time, Zeljka lived in fear of Sekulic.  She suffered a concussion in the car wreck and could not return to work right away.  While at home

recovering, she kept the blinds drawn and was too afraid to walk past any windows that did not have blinds. She purchased a gun for personal protection, but did not want to carry the weapon until she completed her concealed carry class. She scheduled the class for January 8, 2016.

### December 8, 2015 – Aggravated Murder.

{¶16} The evening of December 8, 2015 was Zeljka's first night back to work at the Astoria. She finished her shift around 7:00 a.m. the following morning. A co-worker, Christine Truman, volunteered to walk Zeljka to her car, but Zeljka declined the offer and left the building. Sekulic had been in the parking lot most of the night, drinking and watching her through the windows of the nursing home. Sekulic was in a rental vehicle — a white GMC Terrain.

{¶17} When Zeljka entered the parking lot, Sekulic exited the Terrain with a .45 caliber Ruger handgun he had stolen from his brother's shop the night before.

{¶18} At the same time, Anthony Olivieri, IV was driving himself and his sister to school. His route took him down a road behind the Astoria, which provided a clear view of the Astoria parking lot. Olivieri heard a popping noise, which caused him to look in the direction of the Astoria parking lot. When he did, he witnessed Zeljka lying in the parking lot and Sekulic standing over her. He watched Sekulic shoot Zeljka twice. Olivieri's sister called 9-1-1.

{¶19} Meanwhile, inside the nursing home, Truman also heard popping noises that she initially thought was maintenance people working on the air conditioner. Curious, she went to the window to investigate. When she pulled back the blinds, she saw Zeljka outside alone, lying in the parking lot about 15 feet away from the window. Truman

gabbed another nurse and raced outside. When they reached Zeljka, they found her lying in a pool of blood, gasping for air. Truman called 9-1-1.

{¶20} Sergeant Cline, Deputy Stauffer, and Deputy VanCamp of the Stark County Sheriff's Office arrived on the scene. They found Zeljka lying in a massive amount of blood and could see she had numerous bullet wounds. She appeared to be deceased, but Cline did what he could to help her. Before EMS arrived and took Zeljka, VanCamp secured the scene and Stauffer photographed the scene. Cline summoned the Bureau of Criminal Investigations crime scene unit to process the scene. The deputies determined that Sekulic was the suspect and was driving a white GMC Terrain. Surrounding law enforcement agencies were alerted and Sekulic's brother and father were contacted.

{¶21} Deputy Quentin Robinson and a Massillon police officer went to the home of Sekulic's father, Jovan. As they walked toward the house, Jovan exited the house, walked toward the men and asked, "What did he do?" The officers told Jovan they needed to speak to Sekulic. Jovan called Gligo, who arrived at Jovan's house 10 minutes later.

{¶22} As Sekulic fled towards his Akron home, the officers had Gligo call him. Gligo asked where he was, and said he and Jovan were waiting on him to start work for the day. Sekulic, playing dumb, said he had just woke up, but was on his way. Instead, Sekulic went to the Akron-Canton Airport. He dumped the rental vehicle in the long-term parking lot and retrieved his beige Chevy Malibu. He then began driving south on I-77.

{¶23} When Sekulic failed to appear at Jovan's home, Robinson had Gligo call him again and put the call on speakerphone. Gligo asked where Sekulic was and he replied, "I killed her. Shot her twice in the head." When Gligo expressed disbelief, Sekulic

explained, "I couldn't take it no more.  I couldn't sleep, I just can't handle this."  He then advised Gligo he was not coming to meet them.

{¶24}   Robinson took the phone and advised Sekulic he had heard everything, and that a peaceful resolve was desired.  He asked Sekulic to come to Jovan's house and turn himself in.  Sekulic replied, "You have no idea what I'm going through — you don't know how I feel."  He eventually agreed to come to his father's home, but then never appeared.

{¶25}   Robinson asked Gligo if Sekulic had any weapons.  Gligo said he did not.  However, Gligo recalled that he, Gligo, kept a handgun at his shop.  Sekulic was aware this gun was kept at the shop.  Gligo called the shop and had someone check to see if the weapon was still at the shop.  The gun was missing.

{¶26}   Trooper Stephen Roe of the Ohio State Highway Patrol Cambridge Post was working the afternoon shift on December 9, 2015.  At the beginning of his shift, Roe was advised that a Stark County murder suspect was at large and believed to be driving a white GMC Terrain.  Later Roe was advised that officers had found the Terrain abandoned at the Akron Canton Airport.  A photo of Sekulic was provided to troopers.

{¶27}   Around 12:20 p.m., as Trooper Roe sat in a crossover on I-77, he noticed the driver of a small beige car began to pass a semi-truck.  The driver saw Trooper Roe and slowed significantly.  As the driver went past, he looked directly at Roe.  Roe thought the driver looked like Sekulic, so he pulled out and followed.

{¶28}   As he followed, Trooper Roe ran the plate on the car.  It came back as registered to Sekulic.  He alerted other officers and formulated a plan to pull Sekulic over.

After the other officers joined, Roe activated his lights. Sekulic pulled over, and was taken into custody without incident.

{¶29} Trooper Roe took Sekulic to the Cambridge jail and Sergeant Mike Warner of the State Highway Patrol processed Sekulic's vehicle for impound. On the backseat of the car was the Ruger .45 caliber semiautomatic pistol stolen from Gligo's shop. The magazine of the gun was empty, but there was a round in the chamber. Also in the back seat were a backpack, an expired passport, various food items, and beer. A rifle with ammunition was found in the trunk.

{¶30} Dr. Renee Robinson of the Stark County Coroner's Office performed Zeljka's autopsy. She observed three gunshot wounds to Zeljka's head. These fatal wounds caused massive brain and skull damage. She further observed non-fatal gunshot wounds to Zeljka's left hand, left forearm, and two wounds to her right thigh. One of the wounds to Zeljka's thigh shattered her femur. Robinson ruled Zeljka's cause of death as gunshot wounds to the head, and the manner of death as homicide.

{¶31} The shell casings and bullets recovered from the scene and Zeljka's body were fired from the Ruger.

{¶32} At trial, Sekulic testified on his own behalf. As for the November incident, he claimed he only struck Zeljka's car once and that it was unintentional. He additionally claimed he stopped and got out of his truck to see if she was all right, but then panicked and fled the scene. He further denied that he had a gun that day, and denied telling his brother and Lamtman that he had a gun or disposed of a gun.

{¶33} Sekulic testified that late on December 8, 2015 he bought two six packs of Bud Light Platinum and parked at the Astoria. Sekulic consumed the alcohol and went to

purchase more alcohol from a gas station. Sekulic testified that he intended to kill himself, but he saw Zeljka and became overwhelmed with emotions and he shot her. Sekulic claimed, "I just blacked out." He admitted shooting her, but claimed he remembered only getting out of and then back into the GMC. He then once again "panicked" and fled the scene.

{¶34} After hearing all the evidence and deliberating, the jury found Sekulic guilty of aggravated murder and further found Sekulic used a firearm during the commission of the offense. The jury also found Sekulic guilty of attempted murder and felonious assault, but found he did not possess a firearm during the commission of either crime.

{¶35} The trial court proceeded immediately to sentencing. The state and counsel for Sekulic agreed that the attempted murder conviction and the felonious assault conviction should merge for sentencing. The state elected to proceed to sentencing on the attempted murder charge.

{¶36} For aggravated murder, Sekulic was sentenced to life without the possibility of parole, and an additional 3 years to be served prior to and consecutive with the life sentence for the firearm specification. For attempted murder, Sekulic received 11 years. The trial court ordered Sekulic to serve this sentence consecutive to his sentence for aggravated murder.

*Assignments of Error*

{¶37} Sekulic assigns four assignments of error for our review,

{¶38} "I. APPELLANT'S CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.

**{¶39}** "II. APPELLANT WAS DENIED HIS RIGHTS TO DUE PROCESS AND OF ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION, BECAUSE HIS TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE.

**{¶40}** "III. THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT OVERRULED APPELLANT'S MOTION FOR SEPARATE TRIALS.

**{¶41}** "IV. THE TRIAL COURT ERRED BY ORDERING APPELLANT TO SERVE CONSECUTIVE SENTENCES."

I.

**{¶42}** In his first assignment of error, Sekulic argues that his convictions are against the manifest weight of the evidence produced by the state at trial and further, Sekulic challenges the sufficiency of the evidence.

**{¶43}** Our review of the constitutional sufficiency of evidence to support a criminal conviction is governed by *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), which requires a court of appeals to determine whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*; see also *McDaniel v. Brown*, 558 U.S. 120, 130 S.Ct. 665, 673, 175 L.Ed.2d 582(2010) (reaffirming this standard); *State v. Fry*, 125 Ohio St.3d 163, 926 N.E.2d 1239, 2010–Ohio–1017, ¶ 146; *State v. Clay*, 187 Ohio App.3d 633, 933 N.E.2d 296, 2010–Ohio–2720, ¶ 68.

**{¶44}** Weight of the evidence addresses the evidence's effect of inducing belief. *State v. Thompkins*, 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541 (1997), *superseded by*

*constitutional amendment on other grounds as stated by State v. Smith,* 80 Ohio St.3d 89, 684 N.E.2d 668, 1997-Ohio–355.  Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.  It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them.  Weight is not a question of mathematics, but depends on its effect in inducing belief."  (Emphasis sic.)  Id. at 387, 678 N.E.2d 541, quoting Black's Law Dictionary (6th Ed. 1990) at 1594.

{¶45}   When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "'thirteenth juror'" and disagrees with the fact finder's resolution of the conflicting testimony.  Id. at 387, 678 N.E.2d 541, quoting *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982).  However, an appellate court may not merely substitute its view for that of the jury, but must find that "'the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, supra, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717, 720–721(1st Dist. 1983).  Accordingly, reversal on manifest weight grounds is reserved for "'the exceptional case in which the evidence weighs heavily against the conviction.'"  Id.

> "[I]n determining whether the judgment below is manifestly against
>
> the weight of the evidence, every reasonable intendment and every

reasonable presumption must be made in favor of the judgment and the finding of facts. * * *

"If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."

*Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191–192 (1978).

**Aggravated Murder**

{¶46}   Sekulic contends that his conviction for Aggravated murder is against the weight and sufficiency of the evidence because the state failed to prove beyond a reasonable doubt he acted with prior calculation and design.  Sekulic contends that he instead was acting under the influence of a sudden passion or rage.

{¶47}   R.C. 2903.01 defines the crime of aggravated murder, "(A) No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy…"  Pursuant to R.C. 2901.22(A), "[a] person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."

{¶48}   There is no bright-line test to determine whether prior calculation and design are present.  Rather, each case must be decided on a case-by-case basis. *State v. Taylor*, 78 Ohio St.3d 15, 18-20, 676 N.E.2d 82(1997).  The Ohio Supreme Court has

held, "Where evidence adduced at trial reveals the presence of sufficient time and opportunity for the planning of an act of homicide to constitute prior calculation, and the circumstances surrounding the homicide show a scheme designed to implement the calculated decision to kill, a finding by the trier of fact of prior calculation and design is justified." *State v. Cotton*, 56 Ohio St.2d 8, 10 O.O.3d 4, 381 N.E.2d 190(1978), paragraph three of the syllabus. Accord, *State v. Braden*, 98 Ohio St.3d 354, 785 N.E.2d 439, 2003-Ohio-325 at ¶ 61.

{¶49} Accordingly, to sustain Sekulic's aggravated murder conviction, the state had the burden of proving beyond a reasonable doubt that, under the facts and circumstances of this case, appellant had sufficient time and opportunity to plan Zeljka's death, and that, under the surrounding circumstances, appellant had a scheme designed to implement a calculated decision to kill Zeljka.

{¶50} "[P]rior calculation and design can be found even when the killer quickly conceived and executed the plan to kill within a few minutes." *State v. Coley,* 93 Ohio St.3d 253, 264, 2001-Ohio-1340, 754 N.E.2d 1129. In *State v. Conway,* 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, the Ohio Supreme Court held that one's actions could display a plan to kill. In *Conway*, upon hearing that his brother had been stabbed, Conway retrieved a gun from his car and began shooting at the alleged perpetrator. The Court held that "[a]lthough they took only a few minutes, Conway's actions went beyond a momentary impulse and show that he was determined to complete a specific course of action. Such facts show that he had adopted a plan to kill." Id. at ¶ 46, 842 N.E.2d 996. In the instant case, the evidence established that Sekulic conceived a plan to kill and acted on that plan.

**{¶51}** Gligo testified that the handgun Sekulic used to kill Zeljka was stolen from his shop. Sekulic, in his own testimony, confirmed that he stole the weapon the night before the murder.

**{¶52}** Sekulic rented a vehicle in which to arrive at the scene of the murder. Although it was not unusual for Sekulic to rent vehicles, in this instance, a vehicle unfamiliar to Zeljka allowed Sekulic to lie in wait in the Astoria parking lot and ambush Zeljka when she exited the building. It further allowed Sekulic a getaway plan while police were looking for a white Chevy GMC Terrain, Sekulic dumped the Terrain at the airport's long-term parking lot, and then fled in his own vehicle.

**{¶53}** Immediately after the murder, when Sekulic talked to Gligo with Deputy Robinson listening, he said, "I shot her. I couldn't take it no more. I can't sleep. I just can't handle this." Asked by Robinson to turn himself in Sekulic responded, "You have no idea what I'm going through. You don't know how I feel."

**{¶54}** If the victim is killed in a cold-blooded, execution-style manner, the killing bespeaks aforethought, and a jury may infer prior calculation and design. See *State v. Campbell* (2000), 90 Ohio St.3d 320, 330, 738 N.E.2d 1178; *State v. Palmer*, 80 Ohio St.3d 543, 570, 687 N.E.2d 685(1997); *State v. Taylor*, 78 Ohio St.3d 15, 21, 676 N.E.2d 82(1997); *State v. Mardis*, 134 Ohio App.3d 6, 19, 729 N.E.2d 1272 (10th Dist. 1999).

**{¶55}** Anthony Olivieri, IV testified he witnessed Sekulic shoot Zeljka two times at close range while she lay helplessly on the ground.

**{¶56}** It is undisputed that Sekulic used a handgun in the commission of the aggravated murder of Zeljka. A lack of capacity to form an intent to commit a crime due to self-induced intoxication is no longer a defense to a crime where a mental state is an

element of the crime.  R.C. 2901.21(E).  *See, State v. Koballa,* 8th Dist. Cuyahoga No. 100664, 2014-Ohio-3592, ¶23-24.

**{¶57}**  Viewing the evidence in the case at bar in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that Sekulic purposely, and with prior calculation and design, caused the death of Zeljka through the use of a firearm.  We hold, therefore, that the state met its burden of production regarding aggravated murder with a firearm specification and, accordingly, there was sufficient evidence to support Sekulic's conviction.

**Felonious Assault and Attempted Murder.**

**{¶58}**  R.C. 2923.02(A) provides a definition of attempt: "No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense."

**{¶59}**  The Ohio Supreme Court has held that a criminal attempt occurs when the offender commits an act constituting a substantial step towards the commission of an offense.  *State v. Woods*, 48 Ohio St.2d 127, 357 N.E.2d 1059(1976), paragraph one of the syllabus, *overruled in part by State v. Downs*, 51 Ohio St.2d 47, 364 N.E.2d 1140(1977).  In defining substantial step, the *Woods* Court indicated that the act need not be the last proximate act prior to the commission of the offense.  *Woods* at 131-32, 357 N.E.2d 1059.  However, the act "must be strongly corroborative of the actor's criminal purpose."  *Id*. at paragraph one of the syllabus.  Rather this test "properly directs attention to overt acts of the defendant which convincingly demonstrate a firm purpose to commit a crime, while allowing police intervention, based upon observation of such incriminating

conduct, in order to prevent the crime when the criminal intent becomes apparent." *Woods,* supra at 132, 357 N.E.2d at 1063. In other words, a substantive crime would have been committed had it not been interrupted.

{¶60} R.C. 2903.02(A), Murder, provides, "No person shall purposely cause the death of another." Thus, a person is guilty of attempted murder when he or she "purposely * * * engage[s] in conduct that, if successful, would constitute or result in" the purposeful killing of another. R.C. 2923.02(A); *see, also, State v. Kidder*, 32 Ohio St.3d 279, 283, 513 N.E.2d 311, 316(1987).

{¶61} To prove felonious assault, the state was required to show Sekulic knowingly caused or attempted to cause physical harm to Zeljka with a deadly weapon, here the weapon being his Chevy Silverado. Physical harm is any injury or illness, regardless of gravity or duration. R.C. 2901.01(A)(3).

{¶62} Two witnesses testified to the events of November 24, 2015. Both witnesses described Sekulic "ramming" Zeljka's car with his truck. Lindsay Conant observed the incident from the time Sekulic began chasing Zeljka's car around the parking lot. She saw Sekulic not just ram the car, but also push it across the street. She further saw him ram Zeljka's car several more times before taking off. She testified the incident appeared intentional, not accidental.

{¶63} What is more, shortly after the incident, Sekulic called his brother Gligo. Sekulic told him he had rammed Zeljka's car, causing it to flip upside down. He informed Gligo that he took off before police arrived.

{¶64} Zeljka's sister Stan testified that Zeljka sustained a concussion in the crash and was off work for nearly two weeks recovering.

**{¶65}** Viewing the evidence in the case at bar in a light most favorable to the prosecution, we conclude that a reasonable person could have found beyond a reasonable doubt that Sekulic purposely engaged in conduct, which if successful, would constitute murder, i.e., purposely cause the death of Zeljka, and further Sekulic knowingly caused or attempted to cause physical harm to Zeljka with a deadly weapon. We hold, therefore, that the state met its burden of production regarding attempted murder and felonious assault and, accordingly, there was sufficient evidence to support Sekulic's conviction.

**{¶66}** As an appellate court, we are not fact finders; we neither weigh the evidence nor judge the credibility of witnesses. Our role is to determine whether there is relevant, competent and credible evidence, upon which the fact finder could base his or her judgment. *Cross Truck v. Jeffries*, 5th Dist. Stark No. CA–5758, 1982 WL 2911(Feb. 10, 1982). Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Construction*, 54 Ohio St.2d 279, 376 N.E.2d 578(1978). The Ohio Supreme Court has emphasized: "'[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts. * * *.'" *Eastley v. Volkman,* 132 Ohio St.3d 328, 334, 972 N.E. 2d 517, 2012-Ohio-2179, *quoting Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, *quoting* 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191–192 (1978). Furthermore, it is well established that the trial court is in the best position to determine the credibility of witnesses. *See, e.g., In re Brown*, 9th

Dist. No. 21004, 2002–Ohio–3405, ¶ 9, *citing State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212(1967).

{¶67} Ultimately, "the reviewing court must determine whether the appellant or the appellee provided the more believable evidence, but must not completely substitute its judgment for that of the original trier of fact 'unless it is patently apparent that the fact finder lost its way.'" *State v. Pallai*, 7th Dist. Mahoning No. 07 MA 198, 2008-Ohio-6635, ¶31, *quoting State v. Woullard*, 158 Ohio App.3d 31, 2004-Ohio-3395, 813 N.E.2d 964 (2nd Dist. 2004), ¶ 81. In other words, "[w]hen there exist two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, it is not our province to choose which one we believe." *State v. Dyke*, 7th Dist. Mahoning No. 99 CA 149, 2002-Ohio-1152, at ¶ 13, *citing State v. Gore*, 131 Ohio App.3d 197, 201, 722 N.E.2d 125(7th Dist. 1999).

{¶68} The weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212(1967), paragraph one of the syllabus; *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶118. *Accord, Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *Marshall v. Lonberger*, 459 U.S. 422, 434, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983).

{¶69} The jury as the trier of fact was free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility. "While the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. Craig*, 10th Dist. Franklin No. 99AP-739, 1999 WL

29752 (Mar 23, 2000) *citing State v. Nivens*, 10th Dist. Franklin No. 95APA09-1236, 1996 WL 284714 (May 28, 1996). Indeed, the jury need not believe all of a witness' testimony, but may accept only portions of it as true. *State v. Raver,* 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶21, *citing State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964); *State v. Burke,* 10th Dist. Franklin No. 02AP-1238, 2003-Ohio-2889, *citing State v. Caldwell*, 79 Ohio App.3d 667, 607 N.E.2d 1096 (4th Dist. 1992). Although the evidence may have been circumstantial, we note that circumstantial evidence has the same probative value as direct evidence. *State v. Jenks,* 61 Ohio St.3d 259, 272, 574 N.E.2d 492 (1991), paragraph one of the syllabus, *superseded by State constitutional amendment on other grounds as stated in State v. Smith, 80 Ohio St.3d 89, 102 at n.4, 684 N.E.2d 668 (1997).*

{¶70} In the case at bar, the jury heard the witnesses, viewed the evidence and heard Sekulic's arguments and explanations about his lack of intent to kill Zeljka on November 24, 2015 and December 8, 2015.

{¶71} We find that this is not an "'exceptional case in which the evidence weighs heavily against the conviction.'" *State v. Thompkins*, 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541 (1997), *quoting Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717. The jury neither lost his way nor created a miscarriage of justice in convicting Sekulic of the charges.

{¶72} Based upon the foregoing and the entire record in this matter, we find Sekulic's convictions are not against the sufficiency or the manifest weight of the evidence. To the contrary, the jury appears to have fairly and impartially decided the matters before them. The jury as a trier of fact can reach different conclusions concerning

the credibility of the testimony of the state's witnesses and Sekulic and his arguments. This court will not disturb the jury's finding so long as competent evidence was present to support it. *State v. Walker*, 55 Ohio St.2d 208, 378 N.E.2d 1049 (1978). The jury heard the witnesses, evaluated the evidence, and was convinced of Sekulic's guilt.

**{¶73}** Finally, upon careful consideration of the record in its entirety, we find that there is substantial evidence presented which if believed, proves all the elements of the crimes for which Sekulic was convicted.

**{¶74}** Sekulic's first assignment of error is overruled.

II.

**{¶75}** In his second assignment of error, Sekulic argues that he received ineffective assistance of counsel because his trial counsel failed to request a jury instruction for voluntary manslaughter as an alternative to aggravated murder.

**{¶76}** A claim of ineffective assistance of counsel requires a two-prong analysis. The first inquiry is whether counsel's performance fell below an objective standard of reasonable representation involving a substantial violation of any of defense counsel's essential duties to appellant. The second prong is whether the appellant was prejudiced by counsel's ineffectiveness. *Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180(1993); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674(1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373(1989).

**{¶77}** In order to warrant a finding that trial counsel was ineffective, the petitioner must meet both the deficient performance and prejudice prongs of *Strickland* and *Bradley. Knowles v. Mirzayance*, 556 U.S. 111, 129 S.Ct. 1411, 1419, 173 L.Ed.2d 251(2009);

*Accord, Buck v. Davis,* __U.S. ___, 137 S.Ct. 759, 775, ___L.Ed.2d ___ (U.S. Feb. 22, 2017).

**{¶78}** Voluntary manslaughter is defined in R.C. 2903.03(A):

No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another.

**{¶79}** Voluntary manslaughter is not a lesser-included offense of murder, but rather is an inferior degree of murder. Nonetheless, when determining whether an instruction on voluntary manslaughter should have been given, we apply the same test utilized when determining whether an instruction on a lesser-included offense should have been given. *State v. Shane*, 63 Ohio St.3d 630, 632, 590 N.E.2d 272(1992). An instruction on voluntary manslaughter is appropriate when "the evidence presented at trial would reasonably support both an acquittal on the charged crime of murder and a conviction for voluntary manslaughter." Id.

**{¶80}** "Before giving a jury instruction on voluntary manslaughter in a murder case, the trial judge must determine whether evidence of reasonably sufficient provocation occasioned by the victim has been presented to warrant such an instruction." *Shane*, at paragraph one of the syllabus. "The trial judge is required to decide this issue as a matter of law, in view of the specific facts of the individual case. The trial judge should evaluate the evidence in the light most favorable to the defendant, without weighing the persuasiveness of the evidence." Id. at 637, *citing State v. Wilkins*, 64 Ohio St.2d 382, 388, 415 N.E.2d 303(1980). "An inquiry into the mitigating circumstances of

provocation must be broken down into both objective and subjective components."

*Shane*, at 634.

**{¶81}** When determining whether provocation was reasonably sufficient to induce sudden passion or sudden fit of rage, an objective standard must be applied*. Id.* "For provocation to be reasonably sufficient, it must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control." *Shane* 63 Ohio St.3d at 635, 415 N.E.2d 303. Thus, the court must furnish "the standard of what constitutes adequate provocation, i.e., that provocation which would cause a reasonable person to act out of passion rather than reason." (Citations omitted.) *Shane* at 634, fn. 2. "If insufficient evidence of provocation is presented, so that no reasonable jury would decide that an actor was reasonably provoked by the victim, the trial judge must, as a matter of law, refuse to give a voluntary manslaughter instruction." *Shane* at 364. The subjective component of the analysis requires an assessment of "whether this actor, in this particular case, actually was under the influence of sudden passion or in a sudden fit of rage." Id. "Fear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage." *State v. Mack*, 82 Ohio St.3d 198, 201, 694 N.E.2d 1328(1998).

**{¶82}** In *Shane, supra*, the Supreme Court of Ohio identified several situations that are particularly appropriate for voluntary manslaughter instructions, including "assault and battery, mutual combat, illegal arrest and discovering a spouse in the act of adultery [.]" Id. at 635. The *Shane* Court then declined to state a bright-line rule under which words alone could never cause sufficient provocation but wrote that they would not reasonably provoke deadly force in most situations. Id. at 637.

**{¶83}** The *Shane* Court further examined the effect of Shane's fiancée telling him of her sexual infidelity. Id. at 638. At the time of the crime, Shane awakened his fiancée and repeatedly asked her questions in an attempt to gain a confession. Id. at 637. She denied his accusations and he accused her of lying. Id. Eventually she admitted her infidelity and he lost control. Id. He murdered her via strangulation, a process that expert testimony described as requiring between one and five minutes to complete. Id. The Court distinguished this from a gunshot that could occur quickly and be immediately regretted. Id.

**{¶84}** In *Shane,* the Supreme Court of Ohio held "[w]e disapprove of a rule which does not allow 'mere words' to be sufficient provocation to reduce murder to manslaughter generally, but which makes a specific exception where the provocation consists of mere words by one spouse informing the other spouse of infidelity ." Id. at 637, 590 N.E.2d 272. The Court stated "[t]his exception to the general rule has its foundation in the ancient common-law concept that the wife is the property of the husband. * * * 'When a man is taken in adultery with another man's wife, if the husband shall stab the adulterer, or knock out his brains, that is bare manslaughter: for jealousy is the rage of a man, and adultery is the highest invasion of property * * *." ' (Citation omitted.) Id. at 637, 590 N.E.2d 272.

**{¶85}** The court concluded: "[t]his archaic rule has no place in modern society. Words informing another of infidelity should not be given special treatment by courts trying to determine what provocation is reasonably sufficient provocation." Id.

**{¶86}** Unlike *Shane*, Sekulic knew of Zeljka's relationship before November 24, 2015. The parties were divorced and living apart at the time.

**{¶87}** He killed her on December 8, 2015. Zeljka did not die as the result of a sudden, quick, impulsive, regrettable act. She was shot three times at close range after Sekulic had sat in a rental car in wait for her to get off work. The evidence strongly indicates that Zeljka was not mortally wounded by Sekulic's first shot. Thus, after firing his first shot, Sekulic had every opportunity to appreciate the gravity of his actions and to abandon his course without taking Zeljka's life. Instead, he advanced on the victim and fired two more times, as she lay helplessly on the ground. *See, State v. Rawlings,* 4th Dist., Scioto No. 97CA2539, 1998 WL 961056 (Dec. 24, 1998).

**{¶88}** In addition, the evidence suggests that Sekulic created his own anger by spying on Zeljka and going through her cell phone and computer. *See, State v. Terrion*, 9th Dist. Summit No. 25368, 2011-Ohio-3800, ¶17.

**{¶89}** Finally, in the case at bar, the jury was instructed on the lesser offense of murder, and chose to convict Sekulic of the greater offense of aggravated murder. The jury obviously found that he purposely killed Zeljka with prior calculation and design as the jury rejected the lesser offense of murder. Accordingly, there is little, if any, likelihood the jury would have acquitted on aggravated murder and murder and convicted Sekulic of voluntary manslaughter. *State v. Eubanks,* 8th Dist. Cuyahoga No. 73421, 1999 WL 236686 (Apr. 22, 1999).

**{¶90}** In light of these circumstances, trial counsel was not ineffective. There was no evidence presented to support a sudden fit of passion or rage brought on by any provocation occasioned by Zeljka. Counsel was therefore not ineffective for failing to request a jury instruction for voluntary manslaughter.

**{¶91}** Sekulic's second assignment of error is overruled.

III.

**{¶92}** In his third assignment of error, Sekulic challenges the trial court's denial of his pre-trial motion for separate trials. Sekulic argues that because the November attempted murder was tried at the same time as the December aggravated murder, the jury was permitted to hear evidence of inadmissible prior bad acts.

**{¶93}** "The law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged 'are of the same or similar character.'" *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293, 298(1990), *quoting State v. Torres*, 66 Ohio St.2d 340, 343, 20 O.O.3d 313, 315, 421 N.E.2d 1288, 1290(1981). Under Crim.R. 8(A), offenses that are based on acts "connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct" may be joined together.

**{¶94}** Nonetheless, "[i]f it appears that a defendant * * * is prejudiced by a joinder" a court may grant a severance under Crim.R. 14. The defendant bears the burden to prove prejudice and that the trial court abused its discretion in denying severance. *State v. Torres,* 66 Ohio St.2d 340, 20 O.O.3d 313, 421 N.E.2d 1288, syllabus.

**{¶95}** When a defendant claims that he or she was prejudiced by the joinder of multiple offenses, the court must determine (1) whether evidence of the other crimes would be admissible even if the counts were severed; and (2) if not, whether the evidence of each crime is simple and distinct. *State v. Schaim*, 65 Ohio St.3d 51, 59, 600 N.E.2d 661(1992), *citing State v. Hamblin,* 37 Ohio St.3d 153, 158-159, 524 N.E.2d 476(1988) and *Drew v. United States* 331 F.2d 85(D.C., 1964). "If the evidence of other crimes would be admissible at separate trials, any 'prejudice that might result from the jury's hearing the evidence of the other crime in a joint trial would be no different from that

possible in separate trials,' and a court need not inquire further." Id., *citing Drew v. United States*, 331 F.2d at 90 and *United States v. Riley*, 530 F.2d 767(8th Cir. 1986).

**{¶96}** In the case at bar, the two offenses occurred on different dates and at different locations.

**{¶97}** We recognize the admission of other-acts evidence is limited because of the substantial danger a jury will convict the defendant solely because it assumes the defendant has a propensity to commit criminal acts, or deserves punishment regardless of whether he or she committed the crime charged in the indictment. *Schaim, supra*, 65 Ohio St.3d at 59, 600 N.E.2d 661, *citing State v. Curry*, 43 Ohio St.2d 66, 68, 330 N.E.2d 720 (1975). However, "[a]s long as used for purposes other than proving that the accused acted in conformity with a particular character trait, Evid.R. 404(B) permits the admission of 'other acts' evidence if it is 'related to and share [s] common features with the crime in question.'" *State v. Markwell,* 5th Dist. Muskingum No. CT2011-0054, 2012-Ohio-3096, ¶ 45, *citing State v. Lowe*, 69 Ohio St.3d 527, 634 N.E.2d 616 (1994), paragraph one of the syllabus.

**{¶98}** The November and December incidents were clearly related, and constituted a continuing course of conduct culminating in Zeljka's death. Sekulic failed in his first attempt to kill Zeljka. Gligo testified that thereafter, his brother remained enraged and obsessed with Zeljka's new relationship. On December 9, 2015, after formulating a plan to finish what he started, Sekulic went to the Astoria and killed Zeljka. He then fled the county. Evidence of the November incident related to Sekulic's absence of mistake or accident, as well as his intent in lying in wait with a handgun while waiting for Zeljka.

**{¶99}** Thus, evidence of the November incident would have been relevant and admissible in the trial of the December incident.

**{¶100}** Assuming, *arguendo,* that the evidence did not fit the "other acts" exception, it nevertheless fits the second prong of the *Schaim* test, which requires the evidence of the crime under each indictment to be simple and distinct**.** 65 Ohio St.3d at 59.

**{¶101}** Evidence is "simple and direct" if the jury is capable of readily separating the proof required for each offense, if the evidence is unlikely to confuse jurors, if the evidence is straightforward, and if there is little danger that the jury would "improperly consider testimony on one offense as corroborative of the other." *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, 1 54.

**{¶102}** In the case at bar, separate witnesses testified to the specific incidents and the prosecution introduced evidence of each distinct crime. Sekulic did not deny his participation in either the November of December incident.

**{¶103}** In addition, at the conclusion of the evidence, the trial court specifically instructed the jury:

> The charges set forth in each count in the indictment constitute a separate and distinct matter. You must consider each count and the evidence applicable to each count separately and you must state your findings as to each count uninfluenced by your verdict as to any other count. The Defendant may be found guilty or not guilty of any one or more of the offenses charged in the indictment.

4T. at 745.

{¶104} Finally, the jury found Sekulic not guilty of the firearm specification for the November incident.

{¶105} Accordingly, Sekulic was not able to demonstrate that he was prejudiced by the joinder of claims.

{¶106} Sekulic's third assignment of error is overruled.

IV.

{¶107} In his fourth assignment of error, Sekulic contends the trial court erred in ordering his sentences be served consecutively. Specifically, Sekulic argues that the sentence imposed by the trial court is contrary to law under R.C. 2953.08(A)(4) because the court did not properly weigh the sentencing factors.

{¶108} We review felony sentences using the standard of review set forth in R.C. 2953.08. *State v. Marcum,* 146 Ohio St.3d 516, 2016–Ohio–1002, 59 N.E.3d 1231, ¶22; *State v. Howell,* 5th Dist. Stark No. 2015CA00004, 2015-Ohio-4049, ¶31. R.C. 2953.08(G)(2) provides we may either increase, reduce, modify, or vacate a sentence and remand for resentencing where we clearly and convincingly find that ***either*** *the record* *does not support the sentencing court's findings under R.C. 2929.13(B) or (D),* *2929.14(B)(2)(e) or (C)(4), or 2929.20(I),* ***or*** *the sentence is otherwise contrary to law.* *See, also, State v. Bonnell,* 140 Ohio St.3d 209, 2014–Ohio–3177, 16 N.E.2d 659, ¶28.

{¶109} Accordingly, pursuant to *Marcum* this Court may vacate or modify a felony sentence on appeal only if it determines by clear and convincing evidence that: (1) the record does not support the trial court's findings under relevant statutes, or (2) the sentence is otherwise contrary to law.

{¶110} Clear and convincing evidence is that evidence "which will provide in the

mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford,* 161 Ohio St. 469, 120 N.E.2d 118(1954), paragraph three of the syllabus. *See also, In re Adoption of Holcomb,* 18 Ohio St.3d 361 (1985). "Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Cross,* 161 Ohio St. at 477 120 N.E.2d 118.

### R.C. 2929.14 (C)(4) Consecutive Sentences.

{¶111} R.C. 2929.14(C)(4) concerns the imposition of consecutive sentences.

{¶112} In Ohio, there is a statutory presumption in favor of concurrent sentences for most felony offenses. R.C. 2929.41(A). The trial court may overcome this presumption by making the statutory, enumerated findings set forth in R.C. 2929.14(C)(4). *State v. Bonnell,* 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶23. This statute requires the trial court to undertake a three-part analysis. *State v. Alexander,* 1st Dist. Hamilton Nos. C–110828 and C–110829, 2012-Ohio-3349, 2012 WL 3055158, ¶ 15.

{¶113} R.C. 2929.14(C)(4) provides,

> If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

**{¶114}** Thus, in order for a trial court to impose consecutive sentences the court must find that consecutive sentences are necessary to protect the public from future crime or to punish the offender. The court must also find that consecutive sentences are not disproportionate to the offender's conduct and to the danger the offender poses to the public. Finally, the court must make at least one of three additional findings, which include that (a) the offender committed one or more of the offenses while awaiting trial or sentencing, while under a sanction imposed under R.C. 2929.16, 2929.17, or 2929.18, or while under post release control for a prior offense; (b) at least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the offenses was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct would adequately reflect the

seriousness of the offender's conduct; or (c) the offender's criminal history demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender. *See, State v. White*, 5th Dist. Perry No. 12-CA-00018, 2013-Ohio-2058, ¶36.

{¶115} Recently, in *State v. Bonnell*, 140 Ohio St.3d 209, 2014–Ohio–3177, 16 N.E.2d 659, syllabus, the Supreme Court of Ohio stated that:

> In order to impose consecutive terms of imprisonment, a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry, but it has no obligation to state reasons to support its findings.

{¶116} Furthermore, the sentencing court is not required to recite "a word-for-word recitation of the language of the statute." *Bonnell*, ¶29. "[A]s long as the reviewing court can discern that the trial court engaged in the correct analysis and can determine that the record contains evidence to support the findings, consecutive sentences should be upheld." Id. A failure to make the findings required by R.C. 2929.14(C)(4) renders a consecutive sentence contrary to law. *Bonnell,* ¶34. The findings required by R.C. 2929.14(C)(4) must be made at the sentencing hearing and included in the sentencing entry. Id. at the syllabus. However, a trial court's inadvertent failure to incorporate the statutory findings in the sentencing entry after properly making those findings at the sentencing hearing does not render the sentence contrary to law; rather, such a clerical mistake may be corrected by the court through a nunc pro tunc entry to reflect what actually occurred in open court. *Bonnell,* ¶30.

{¶117} In this case, the record does support a conclusion that the trial court made all of the findings required by R.C. 2929.14(C)(4) at the time it imposed consecutive sentences.

{¶118} **R.C. 2929.14(C)(4): [T]he court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public.**

{¶119} At sentencing the trial court found,

> The Court finds that consecutive sentences are necessary to protect the public from future crime, that they are necessary to punish the Defendant, and that they are not disproportionate of the seriousness of the Defendant's conduct and the danger that the Defendant poses to the public.

5T. at 872. The findings are reflecting in the court's sentencing entry. *Judgment Entry Found Guilty by Jury and Sentenced Imposed,* filed June 6, 2016.

{¶120} **R.C. 2929.14(C)(4)(a): The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.**

{¶121} In the case at bar, the trial court found,

> The Court further finds consecutive sentences are warranted because the aggravated murder was committed while the Defendant was on bond. The Defendant had a right, guaranteed by the Constitution of the

United States of America, to be on bond, he abused that right for his own

purpose, warranting a sentence greater than his life.

5T. at 873.  The findings are reflected in the court's sentencing entry.  *Judgment Entry*

*Found Guilty by Jury and Sentenced Imposed,* filed June 6, 2016.

**{¶122}** **R.C. 2929.14(C)(4)(b): At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.**

**{¶123}** In the case at bar, the trial court found,

The Court further finds that the offenses were committed as a course

of conduct and that the harm by those offenses was so great that no single

prison term for any offense is adequate to reflect the seriousness of the

Defendant's conduct.

**{¶124}** 5T. at 873.  The findings are reflected in the court's sentencing entry.  *Judgment Entry Found Guilty by Jury and Sentenced Imposed,* filed June 6, 2016.

**{¶125}** **R.C. 2929.14(C)(4)(c): The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.**

**{¶126}** The Court specifically considered this a mitigating factor.  5T. at 871.

**{¶127}** We find that the record in the case at bar clearly and convincingly supports the trial court's findings under R.C.  2929.14(C)(4).

**{¶128}** R.C. 2929.11(A) governs the purposes and principles of felony sentencing

and provides that a sentence imposed for a felony shall be reasonably calculated to achieve the two overriding purposes of felony sentencing, which are (1) to protect the public from future crime by the offender and others, and (2) to punish the offender using the minimum sanctions that the court determines will accomplish those purposes. Further, the sentence imposed shall be "commensurate with and not demeaning to the seriousness of the offender's conduct and its impact on the victim, and consistent with sentences imposed for similar crimes by similar offenders."  R.C. 2929.11(B).

**{¶129}** R.C. 2929.12 sets forth the seriousness and recidivism factors for the sentencing court to consider in determining the most effective way to comply with the purposes and principles of sentencing set forth in R.C. 2929.11.  The statute provides a non-exhaustive list of factors a trial court must consider when determining the seriousness of the offense and the likelihood that the offender will commit future offenses.

**{¶130}** In *State v. Kalish,* 120 Ohio St.3d 23, 2008-Ohio-4912, 896 N.E.2d 124, the court discussed the effect of the *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470 decision on felony sentencing.  The court stated that in *Foster* the Court severed the judicial-fact-finding portions of R.C. 2929.14, holding that "trial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum sentences."  *Kalish* at ¶ 1 and ¶11, *citing Foster* at ¶100, *See also, State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306;  *State v. Firouzmandi*, 5th Dist. Licking  No. 2006-CA-41, 2006-Ohio-5823.

**{¶131}** "Thus, a record after *Foster* may be silent as to the judicial findings that appellate courts were originally meant to review under 2953.08(G)(2)."  *Kalish* at ¶ 12.

However, although *Foster* eliminated mandatory judicial fact-finding, it left intact R.C. 2929.11 and 2929.12, and the trial court must still consider these statutes. *Kalish* at ¶13, *see also State v. Mathis*, 109 Ohio St.3d 54, 2006-Ohio-855, 846 N.E.2d 1; *State v. Firouzmandi supra* at ¶ 29.

{¶132} Thus, post-*Foster*, "there is no mandate for judicial fact-finding in the general guidance statutes.  The court is merely to 'consider' the statutory factors." *Foster* at ¶ 42.  *State v. Rutter*, 5th Dist. No. 2006-CA-0025, 2006-Ohio-4061; *State v. Delong*, 4th Dist. No. 05CA815, 2006-Ohio-2753 at ¶ 7-8.  Therefore, post-*Foster,* trial courts are still required to consider the general guidance factors in their sentencing decisions.

{¶133} There is no requirement in R.C. 2929.12 that the trial court states on the record that it has considered the statutory criteria concerning seriousness and recidivism or even discussed them.  *State v. Polick*, 101 Ohio App.3d 428, 431(4th Dist. 1995); *State v. Gant,* 7th Dist. No. 04 MA 252, 2006-Ohio-1469, at ¶60 (nothing in R.C. 2929.12 or the decisions of the Ohio Supreme Court imposes any duty on the trial court to set forth its findings), citing *State v. Cyrus*, 63 Ohio St.3d 164, 166, 586 N.E.2d 94(1992); *State v. Hughes,* 6th Dist. No. WD-05-024, 2005-Ohio-6405, ¶10 (trial court was not required to address each R.C. 2929.12 factor individually and make a finding as to whether it was applicable in this case), *State v. Woods,* 5th Dist. No. 05 CA 46, 2006-Ohio-1342, ¶19 ("... R.C. 2929.12 does not require specific language or specific findings on the record in order to show that the trial court considered the applicable seriousness and recidivism factors").  (Citations omitted).

{¶134} Prior to sentencing, the Court received evidence from the victim's sister Stanislava Vranesevic, the victim's sister who resides in Croatia, Markija (Maria) Trkulja,

and from the victim's two children. The trial court considered statements from Sekulic and his attorney.

{¶135} Accordingly, the trial court considered the purposes and principles of sentencing [R.C. 2929.11] as well as the factors that the court must consider when determining an appropriate sentence. [R.C. 2929.12]. The trial court has no obligation to state reasons to support its findings. Nor is it required to give a talismanic incantation of the words of the statute, provided that the necessary findings can be found in the record and are incorporated into the sentencing entry.

{¶136} Upon review, we find that the trial court's sentencing on the charges complies with applicable rules and sentencing statutes. The sentence was within the statutory sentencing range. Furthermore, the record reflects that the trial court considered the purposes and principles of sentencing and the seriousness and recidivism factors as required in Sections 2929.11 and 2929.12 of the Ohio Revised Code and advised Sekulic regarding post release control. Upon a thorough review, we find the record clearly and convincingly supports the sentence imposed by the trial court.

{¶137} We find the trial court properly considered the purposes and principles of sentencing set forth in R.C. 2929.11, as well as the applicable factors set forth in R.C. 2929.12, along with all other relevant factors and circumstances. While Sekulic may disagree with the weight given to these factors by the trial judge, Sekulic's sentence was within the applicable statutory range, and therefore, we have no basis for concluding that it is contrary to law.

{¶138} Sekulic's fourth assignment of error is overruled.

{¶139} The judgment of the Stark County Court of Common Pleas is affirmed.


By Gwin, P.J.,

Hoffman, J., and

Wise, John, J., concur